In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-4362

SHERWIN I. RAY, et al.,

*Plaintiffs-Appellants*,

*v.*

CITIGROUP GLOBAL MARKETS, INC., et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 3157—**Matthew F. Kennelly**, *Judge*.

ARGUED SEPTEMBER 7, 2006—DECIDED APRIL 12, 2007

Before RIPPLE, KANNE, and WOOD, *Circuit Judges*.

WOOD, *Circuit Judge*. This is a case brought by a group of disappointed investors who lost millions of dollars after the shares they had purchased of SmartServ Online, Inc. (SSOL) collapsed in value. They blame their losses on John Spatz, an investment advisor, his employer, Citigroup Global Markets, Inc., and the employer's parent company, Citigroup, Inc. (collectively, Citigroup). The district court, however, granted summary judgment in the defendants' favor, finding that the federal claims the plaintiffs were hoping to assert under § 10(b) and § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5, were doomed because plain-

tiffs had no evidence of loss causation. The district court also dismissed plaintiffs' state claims, on the ground that they were preempted by the Securities Litigation Uniform Standards Act of 1998 (SLUSA), 15 U.S.C. § 78bb(f)(1). The latter ruling is not before us, but plaintiffs would like to convince us that they may proceed with the federal theories of recovery. Although we have applied the favorable *de novo* standard of review to the district court's ruling, we conclude that plaintiffs' claims cannot succeed. We therefore affirm.

**I**

The plaintiffs are more than a hundred retail investors who purchased millions of dollars' worth of stock in SSOL between 2000 and 2002. SSOL was a small company in the wireless data services business. The value of its shares had soared during the late 1990s, going from less than $1 per share in early October 1999 to more than $170 in February 2000. By early April 2000, the price had settled down to a range between $70 and $90 per share. Defendant John Spatz is an institutional stockbroker employed by Citigroup (in an entity formerly known as Salomon Smith Barney, Inc.). Spatz worked with retail brokers Howard Borenstein, Mel Stewart, and Angelo Armenta, who in most cases were the people who directly advised the plaintiffs to buy SSOL stock. Citigroup is a global financial services firm that, as relevant here, provides investment and asset management services. Spatz, according to plaintiffs, was Citigroup's top institutional salesman, and thus his opinions carried great weight with others in the industry.

The plaintiffs alleged that Spatz, along with two other Citigroup stockbrokers (Francis X. Weber, Jr., and Anthony Louis DiGregorio, Jr., neither of whom was named as a defendant) fraudulently induced the plaintiffs to

purchase ever-increasing amounts of SSOL stock by making misrepresentations both to plaintiffs and to their retail brokers, Borenstein, Stewart, and Armenta. The rub was this: throughout the time period at issue—2000 to 2002—the stock market as a whole was declining. Publicly available information tells us that the Dow Jones Industrial Average stood at 11,723 on January 14, 2000, which at the time was an all-time high; by December 31, 2002, after interim ups and downs, it was 8,341. See Chart of the Dow Jones Industrial Average since 1974, at http://www.the-privateer.com/chart/dow-long.html (visited March 14, 2007). Nevertheless, Spatz and Citigroup falsely told the plaintiffs that SSOL was still a great deal. They claimed that SSOL had signed substantial contracts with large corporations like Microsoft, Swisscom, Qualcomm, Verizon Wireless, IBM, and Citigroup itself. These contracts, they said, would produce millions of dollars in revenue for SSOL over time. They claimed that the institutional analysts at Citigroup thought highly of SSOL and were prepared to initiate "research coverage," and they represented that SSOL had obtained large sources of financing.

According to the plaintiffs, what Spatz and Citigroup did *not* say was that SSOL had problems (about which it knew) with its current contracts with companies such as GoAmerica, Hutchison Telecom, and Sunday Telecommunications. Moreover, plaintiffs say, Spatz urged them to invest in SSOL to the exclusion of almost all other companies. (This may well have been poor portfolio design; whether it was fraud is a different question.) The information about research coverage lured plaintiffs into thinking that Citigroup (and Spatz) genuinely believed that SSOL was a safe investment and that there was little risk in directing their money to SSOL. In fact, according to plaintiffs, Citigroup thought no such thing and was well aware that SSOL was a risky investment. One clue might have been the fact, disclosed in SSOL's public filings, that

the company had yet to derive any significant revenue from its wireless data business. Had plaintiffs been told the truth about the risk they were incurring, they claim, they would have sold the shares they had and refrained from purchasing any more shares. When the truth finally emerged, the stock price of SSOL, which had been more than $80 per share in June 2000, plunged to only $1 per share. As the district court pointed out, the undisputed facts showed that SSOL's competitors suffered the same fate: 724 Solutions lost 98.9% of its value over that time; Aether Systems lost 98.39% of its value, and Openwave Systems lost 94.35% of its value.

The district court found that the defendants were entitled to summary judgment. It looked to the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), for the elements of a claim under § 10(b) and Rule 10b-5. In *Dura*, the Court summarized those elements as follows, for cases involving publicly traded securities and purchases or sales in public securities markets:

(1) a material misrepresentation (or omission);

(2) scienter, i.e., a wrongful state of mind;

(3) a connection with the purchase or sale of a security;

(4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation," see *Basic* [*Inc. v. Levinson*, 485 U.S. 224,] 248-249 (nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in its absence);

(5) economic loss; and

(6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

544 U.S. at 341-42 (most citations omitted). The loss causation element was the most obvious missing link, in the district court's view: plaintiffs had no evidence that, if believed, would show that the particular misrepresentations they accused Spatz and Citigroup of making had a causal connection with the loss in value of the SSOL shares. See also *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683 (7th Cir. 1990).

## II

On appeal, plaintiffs have pointed to evidence in the record that, they believe, provides that missing link. They acknowledge that the stock price of SSOL's competitors fell just as precipitously as the SSOL price, but they urge us to take another look at the evidence. The affidavits, depositions, and documentary evidence in the record reveal, they argue, that Spatz's and Citigroup's misrepresentations were *the* reason (plaintiffs' emphasis) for the decline in SSOL's share price. This is because SSOL never had the contracts, revenues, or funding that Spatz repeatedly said that it did.

The question we must answer is whether this additional information was enough to show that the loss in value of SSOL's shares was proximately caused by the defendants' alleged misrepresentations. See *Dura*, 544 U.S. at 343. As the Court explained in *Dura*, it is not enough to show that shares were purchased at a high price (whether inflated or not) and later sold at a much lower price. The reason is that many different factors might account for the drop in value:

> If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price might mean a later loss. But that is far from inevitably so. When the purchaser subsequently

resells such shares, even at a lower price, that lower
price may reflect, not the earlier misrepresentation,
but changed economic circumstances, changed investor
expectations, new industry-specific or firm-specific
facts, conditions, or other events, which taken sepa-
rately or together account for some or all of that lower
price.

544 U.S. at 342-43. If the plaintiff cannot prove "loss
causation"—that is, the fact that the defendant's actions
had something to do with the drop in value—then the
claim must fail.

This court made the same point years before *Dura* in
*Bastian*, where we wrote, "[W]hat securities lawyers
call loss causation *is* the standard common law fraud
rule . . . merely borrowed for use in federal securities
fraud cases." 892 F.2d at 683. This element of the claim
attempts to distinguish cases where the misrepresenta-
tion was responsible for the drop in the share's value from
those in which market forces are to blame. See *Law v.
Medco Research, Inc.*, 113 F.3d 781, 786-87 (7th Cir. 1997);
*Ryan v. Wersi Elec. GmbH & Co.*, 59 F.3d 52, 54 (7th Cir.
1995).

Although they try mightily to convince us otherwise, it
seems to us that plaintiffs here are confusing loss causa-
tion, which we have just described, with transaction
causation. Transaction causation is nothing but proof
that a knowledgeable investor would not have made the
investment in question, had she known all the facts. If the
summary judgment record supports the plaintiff only on
that point, and not on loss causation, then the defendant
is entitled to prevail. As we said in *Caremark, Inc. v.
Coram Healthcare Corp.*, "[I]t [is] not sufficient for an
investor to allege only that it would not have invested but
for the fraud. Such an assertion alleges transaction
causation, but it does not allege loss causation. Rather, it

is also necessary to allege that, but for the circumstances that the fraud concealed, the investment . . . would not have lost its value." 113 F.3d 645, 648-49 (7th Cir. 1997) (quoting *Bastian*, 892 F.2d at 683).

There are several ways in which a plaintiff might go about proving loss causation. The first is sometimes called the "materialization of risk" standard. *Caremark* takes that approach, requiring the plaintiff to prove that "it was the very facts about which the defendant lied which caused its injuries." 113 F.3d at 648. The second approach is the "fraud-on-the-market" scenario, which the Supreme Court discussed in *Dura*. Under that theory, plaintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception. Finally, *Bastian* suggests that loss causation might be shown if a broker falsely assures the plaintiff that a particular investment is "risk-free." 892 F.2d at 685-86. We explore these in turn to see if plaintiffs might have raised a genuine issue of material fact under one or more approach.

We can dispense quickly with the materialization of risk idea. There is no evidence in this record from which a jury could conclude that the drop in the value of the SSOL shares was attributable somehow to Spatz's or Citibank's alleged misrepresentations. The defendants introduced expert evidence that SSOL lost its value because of market forces, and the plaintiffs have offered nothing to rebut that theory—no expert testimony suggesting that the collapse was caused by the lack of the fraudulently promised contracts and financing, no evidence that companies similar to SSOL that had firm contracts survived. Plaintiffs' only expert, David Cohen, considered only the amount of their damages, not the cause of those damages.

Plaintiffs similarly have not introduced enough evidence to go forward on a fraud-on-the-market theory. The record

affirmatively contradicts the assertion that the value of the SSOL's stock declined just when the alleged misrepresentations were revealed. That is what *Dura* required them to show, and they did not. Their initial complaint alleges that it was not until June 2002 that they discovered Spatz's alleged lies. But by that time—even by May 2002—the price of SSOL's shares had already collapsed. As the district court noted, it had "settled to just over two dollars per share, which was down from sixty-five dollars per share in June 2000, when the plaintiffs began purchasing SSOL stock based on Spatz's recommendations." In the face of that evidence, summary judgment for defendants on this theory was inevitable.

The approach that comes closest to satisfying plaintiffs' burden is the "risk-free" idea. In *dicta*, *Bastian* described this theory as follows:

> Suppose a broker gives false assurances to his customer that an investment is risk-free. In fact it is risky, the risk materializes, the investment is lost. Here there can be no presumption that but for the misrepresentation the customer would have made an equally risky investment. On the contrary, the fact that the broker assured the customer that the investment was free of risk suggests that the customer was looking for a safe investment. Liability in such a case . . . is therefore consistent with nonliability in a case such as [*Bastian*].

892 F.2d 685-86. But the next sentences in *Bastian* indicate that it would be necessary for a broker to use very explicit language before loss causation could be proved this way. In *Bastian*, the plaintiffs had invested in oil and gas partnerships that lost value. We noted that "[t]he plaintiffs in the present case were not told that oil and gas partnerships are risk-free. They knew they were assuming a risk that oil prices might drop unexpectedly. They are

unwilling to try to prove that anything beyond the materializing of that risk caused their loss." *Id.* at 686. We need not decide exactly how explicit the representation would have to be, or even if this approach survives *Dura*, because the district court found that there was no evidence that Spatz ever said that the SSOL investment was *free* of risk. This is not surprising, because literally speaking no investment in the world would meet such a demanding standard. It is one thing to describe something as a good investment, and quite another to state that the risk of loss is something close to zero. It is also worth noting that "risky" investments are by no means necessarily "bad" investments: risk can lead to higher returns, as many market success stories attest.

There is no evidence that Spatz and Citibank fraudulently assured the plaintiffs that the SSOL stock would survive the collapse in the market that the other stocks in that sector were experiencing. True, Spatz told the plaintiffs to hang onto their stock, saying things like "it was a *certain money winner* because Smith Barney was going to include it in all their divisions" and words to that effect. But this was against the backdrop of publicly available information suggesting that SSOL was, to put it charitably, a volatile stock, that had gone from less than $1 a share in 1999, to $170 a share in February 2000, to $80 a share in June 2000, back down to $1 a share by May or June of 2002. Spatz said nothing about how long someone would need to be prepared to hang onto the SSOL stock in order to reap the expected benefits, nor did he say anything about investments in the data services business being risk-free.

**III**

Defendants have also argued that the district court's judgment can be upheld on several alternative grounds:

the lack of actionable misstatements; lack of proof of scienter; and plaintiffs' inability to prove justifiable reliance. Like the district court, we see no need to address these points, because we find that plaintiffs did not introduce enough evidence on the loss causation element to create a genuine issue of material fact. We therefore AFFIRM the judgment of the district court.

A true Copy:

     Teste:

 

              _____

              *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*