**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NUVEEN MUNICIPAL HIGH INCOME
OPPORTUNITY FUND; THE NUVEEN
MUNICIPAL TRUST ON BEHALF OF ITS
SERIES NUVEEN HIGH YIELD
MUNICIPAL BOND TRUST,
　　　　　　*Plaintiffs-Appellants*,

v.

CITY OF ALAMEDA, CALIFORNIA, on
behalf of itself and Alameda Power
& Telecom; ALAMEDA POWER &
TELECOM, a department of the City
of Alameda; ALAMEDA PUBLIC
FINANCING AUTHORITY; ALAMEDA
PUBLIC IMPROVEMENT
CORPORATION,
　　　　　　*Defendants-Appellees*.

No. 11-17391

D.C. No.
3:08-cv-04575-SI

NUVEEN MUNICIPAL HIGH INCOME
OPPORTUNITY FUND; THE NUVEEN
MUNICIPAL TRUST ON BEHALF OF ITS
SERIES NUVEEN HIGH YIELD
MUNICIPAL BOND TRUST,
　　　　　　*Plaintiffs-Appellees*,

v.

No. 11-17496

D.C. No.
3:08-cv-04575-SI

OPINION

CITY OF ALAMEDA, CALIFORNIA, on
behalf of itself and Alameda Power
& Telecom; ALAMEDA POWER &
TELECOM, a department of the City
of Alameda; ALAMEDA PUBLIC
FINANCING AUTHORITY, ALAMEDA
PUBLIC IMPROVEMENT
CORPORATION,
                *Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted
May 13, 2013—San Francisco, California

Filed September 19, 2013

Before: M. Margaret McKeown and Paul J. Watford,
Circuit Judges, and Algenon L. Marbley, District Judge.[*]

Opinion by Judge McKeown

---

[*] The Honorable Algenon L. Marbley, District Judge for the U.S.
District Court for the Southern District of Ohio, sitting by designation.

## SUMMARY[**]

### Securities Fraud

The panel affirmed the district court's summary judgment in a securities fraud action brought by purchasers of municipal bonds offered by the City of Alameda to finance the development of a cable and Internet system.

The panel held that for federal claims under §§ 10(b)(5) and 20(a) of the Securities Exchange Act of 1934, the bond purchasers failed to establish a triable issue of fact on the issue of loss causation. The panel held that the purchasers' theory that they would not have purchased the bonds but for the City's alleged misrepresentation of the risks went only to show reliance, or transaction causation. Missing was the necessary link between the claimed misrepresentations and the economic loss the purchasers suffered when the City sold the cable and Internet system. The panel held that the fact that the bonds were traded on an inefficient market, rather than a more familiar efficient market like one of the stock exchanges, did not change the result.

The panel held that the City enjoyed statutory immunity on the bond purchasers' state law claims because California courts have applied § 818.8 of the California Government Claims Act to immunize public entities from liability for misrepresentations sanctioned by those entities, and the California Corporate Securities Act does not override that immunity.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Affirming the district court's denial of the City's motion for defense costs, the panel held that although the City was entitled to summary judgment, the bond purchasers had reasonable cause to bring suit, and the evidence sufficed to establish their good faith.

## COUNSEL

Scott W. Wilkinson (argued), Michael P. Cillo, and Melissa J. Hessler, Davis & Ceriani, P.C., Denver, Colorado, for Plaintiffs-Appellants and Cross-Appellees.

Gregory R. Aker (argued), Eric J. Firstman, and Richard E. Elder, Wulfsberg Reese Colvig & Firstman, P.C., Oakland, California; Janet C. Kern, Office of the City Attorney, City of Alameda, Alameda, California, for Defendants-Appellees and Cross-Appellants.

## OPINION

McKEOWN, Circuit Judge:

This appeal stems from the City of Alameda's offering of municipal bonds to finance the development of a cable and Internet system. Nuveen Municipal High Income Opportunity Fund, the Nuveen Municipal Trust for the Nuveen High Yield Municipal Bond Fund, and Pacific Specialty Insurance Company (collectively, "Nuveen") purchased about twenty million dollars worth of the bonds and then lost money on the bonds when the City sold the system several years later. Nuveen brought federal and state securities claims against the City, alleging that the City

misrepresented the risks to investors. We affirm the district court's summary judgment in favor of the City.

For its federal claims under Section 10b-5 and Section 20(a) of the Securities Exchange Act of 1934, Nuveen has not shown a triable issue of fact on the issue of loss causation. Nuveen's theory that it would not have purchased the securities but for the City's alleged misrepresentation of the risks goes only to show reliance, or transaction causation. Missing is the necessary link between the claimed misrepresentations and the economic loss Nuveen suffered.

Although Nuveen pitches its appeal as novel because the notes were traded on an inefficient market, rather than a more familiar efficient market like one of the stock exchanges, this wrinkle does not change the result. Federal securities law requires proof of both transaction and loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

The City enjoys statutory immunity from suit on Nuveen's state claims. California courts have applied § 818.8 of California's Government Claims Act to immunize public entities from liability for misrepresentations sanctioned by those entities. The California Corporate Securities Act does not override that immunity.

Finally, we also affirm the district court's denial of the City's motion for defense costs. Although the City is entitled to summary judgment, Nuveen had reasonable cause to bring suit and the evidence suffices to establish its good faith.

## BACKGROUND

## I.   THE NOTES

The City of Alameda decided to expand its municipal electrical system to include telecommunications—cable TV and Internet—in the late 1990s.  Alameda Power & Telecom (Alameda Power or "APT"), a division of the City, borrowed money to construct the system.  In 2004, Alameda Power issued $33 million in Revenue Bond Anticipation Notes ("Notes") to refinance its debt and complete construction. Alameda Power hired Stone & Youngberg, a municipal bond underwriter, to prepare the Official Statement accompanying the Notes, which set forth projections regarding the telecom system's viability and profitability.  Alameda Power also hired consultant Uptown Services to issue a feasibility report on the proposed refinancing, on which Stone & Youngberg relied in part.

The Official Statement included discussion of "certain risk factors" affecting the viability of the system.   It specifically disclosed the risk of competition from other cable television and Internet service providers, chief among them Comcast.  It also discussed the risks presented by competitive technologies such as Internet and satellite-based television, programming costs, limited financial resources that could "increase the vulnerability of the Telecom System to general adverse economic and cable industry conditions," limited operating history, and limited franchise authority. Although the Official Statement expressed an expectation that the system could be a strong competitor in the field, it specifically warned that "no assurances in this regard can be provided to investors in the Notes or in any future financing which Alameda P&T may require to repay the Notes."

As the Notes were not rated, the Official Statement also warned that they had limited liquidity.  The minimum purchase amount for the Notes was $250,000, limiting the offering to sophisticated investors.  The Notes offered an interest (coupon) rate of 7 percent, with yield to maturity at 7.25 percent.  Reflecting the high-risk nature of the Notes, this return was more than double the yield of a typical tax-free municipal bond in 2004.

The Official Statement included Uptown's feasibility report as an appendix.  In preparing the August 2003 report, Uptown relied on information that Alameda Power provided as of July 2003, including a five-year financial forecast and subscriber and financial growth projections.

Nuveen purchased $17,750,000 in face value of the Notes at issuance and made several additional purchases of the Notes over the following year and a half.  Ultimately, Nuveen held $20,550,000 in face value of the Notes.  Nuveen received interest payments totaling $6,516,003 over the life of the Notes.

The Notes were set to mature on June 1, 2009. Repayment of the Notes was secured by three sources: (1) net revenue generated by the telecom system, (2) a potential refinancing of the telecom system prior to or at maturity, and (3) net available proceeds from the sale of the system.  The Official Statement represented that Alameda Power did not expect that net revenues would suffice to cover the principal of the Notes at maturity and that it "expect[ed] to be dependent for the payment of principal on a revenue bond or similar financing to the extent such a financing may be feasible at that time."

The system performed poorly in the years following the issuance of the Notes. Competition from Comcast was fierce. In 2007, the United States economy began to show signs of a recession that deepened in 2008. During this period, the Notes were traded infrequently. There were eighteen trades between January 31, 2005 and May 1, 2008, all of which were at or near the face value of the Notes.

In June 2008, Alameda Power determined that refinancing the Notes was not a viable option in light of the overall economic downturn and decided to sell the telecom system. Comcast bought the telecom system in November 2008 for approximately $15 million, and the City paid all net proceeds from the sale to the Noteholders. Nuveen received $10,105,110 toward the principal of the Notes it held, a shortfall of approximately $10 million.

## II. PROCEDURAL HISTORY AND NUVEEN'S CLAIMS

Nuveen brings claims against the City for alleged violations of Section 10b-5 and Section 20(a) of the Securities Exchange Act of 1934 and California Corporate Securities Act §§ 24000, 25500, and 25504.1. Nuveen argues that the Official Statement contained inflated and unrealistic projections that materially overstated the telecom system's anticipated performance. According to Nuveen, these misrepresentations induced Nuveen to purchase the Notes and caused Nuveen to suffer economic losses when the system was sold. Nuveen seeks to recover as damages the entire difference between the $20,550,000 face value of its Notes and the $10,105,110 it received from the sale of the system.

The City moved for summary judgment on all claims. On the federal claims, the City argued Nuveen could not establish

a triable issue that the City's alleged material misrepresentations caused Nuveen's losses. Nuveen relied on expert testimony to show this causal connection. Its primary expert, Dr. David Sosa, took the position that the City's June 2008 notice of the planned sale of the system served as a "corrective disclosure" that revealed the truth about the City's allegedly fraudulent conduct, causing the Notes to lose value.

Nuveen also relied on the testimony of Gregory Rosston, a Ph.D. economist, who was of the view that "[t]he projections in the Official Statement lacked a reasonable basis because they did not reflect the available information when the Official Statement was issued on April 8, 2004." Rosston stated that the OS relied on "outdated assumptions that artificially increased the expected [average revenue per unit] and number of subscribers in the subsequent five years." Specifically, he noted that the Official Statement incorporated the Uptown feasibility report prepared in August 2003, even though "additional information about APT Cable's performance in the seven months from September 2003 to March 2004 and Alameda Power's expectations about future performance" had come to light. Rosston also noted that ten days before issuance of the Official Statement, the Alameda Public Utilities Board adopted a five-year business plan for Alameda Power that "used significantly less optimistic projections of Alameda Power Cable's future financial performance than the projections in the Official Statement." Rosston concluded that "[r]easonable projections would have been much lower" than those in the Official Statement.

Finally, Peggy Garfunkel, an expert in municipal bonds, opined that for the Notes to have been "marketable" in 2004, "it was necessary for Alameda to show that long term revenue bonds could be issued in 2009," that is, that the Notes could

be refinanced when they were set to mature.  She concluded that had the Official Statement relied on earlier, lower projections, specifically those that had appeared in a March 2004 Business Plan prepared by Alameda Power, the Notes "would not have been marketable."

The district court excluded Dr. Sosa's opinion as unsupported and unreliable and granted summary judgment to the City on the federal claims because Nuveen failed to establish loss causation.  The district court granted summary judgment to the City as to the state law claims on the ground that the City enjoyed immunity under California law.  The district court denied the City's motion for defense costs under California Code of Civil Procedure § 1038(a).  Nuveen appealed summary judgment, and the City cross-appealed the denial of defense costs.  We review a grant of summary judgment de novo.  *Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011).

## DISCUSSION

### I.  FEDERAL CLAIMS

The federal claims in this appeal turn on loss causation—an essential element of federal securities law claims.  Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5 require proof of: (1) material misrepresentation or omission, (2) scienter, (3) connection with the purchase or sale of a security, (4) reliance, often referred to as transaction causation, (5) economic loss, and (6) loss causation.  *Dura Pharmaceuticals*, 544 U.S. at 341–42.

The two elements of causation—transaction causation and loss causation—are distinct and map onto familiar common law concepts. Transaction causation constitutes "actual" or "but-for" cause. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) ("[T]o prove transaction causation, the plaintiff must show that, but for the fraud, the plaintiff would not have engaged in the transaction at issue. . . ."). Transaction causation is akin to reliance; it focuses on the time of the transaction and "refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (emphasis added). There is no dispute that Nuveen met its burden on transaction causation by putting forth ample evidence from which a reasonable juror could conclude that Nuveen would not have purchased the Notes had the City not made the allegedly fraudulent misrepresentations in the Official Statement.

The loss causation element, however, requires that Nuveen also show "proximate" or "legal" cause. *See Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008) ("Though loss causation is an 'exotic name' for this concept, the standard does not differ from that employed in a common law fraud case."). Nuveen claims that because the Notes were traded only sporadically, the market was inefficient and that a novel standard should apply, namely that loss causation is satisfied if "the Notes could never have been sold *but for* the City's fraud." We reject this approach—which finds no support in the law—because it collapses transaction causation with loss causation. The loss causation element is a fixture of federal law and applies to all

10b-5 claims, whether involving securities traded in an efficient or inefficient market.[1]

## A.  LOSS CAUSATION PRINCIPLES AND PROOF

Loss causation is simply "a causal connection between the material misrepresentation and the loss." *Dura Pharmaceuticals*, 544 U.S. at 342.  The loss causation requirement was codified in the Private Securities Litigation Reform Act:

> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter *caused the loss* for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4) (emphasis added).  The statute applies to "any private action" and does not carve out a different or special standard depending on the type of market in which securities are traded.

---

[1] As the Seventh Circuit aptly explained, "'[e]fficiency' is not an all-or-nothing phenomenon." *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1130 (7th Cir. 1993).  "The price in an open and developed market usually reflects all available information, because the price is an outcome of competition among knowledgeable investors. . . .  We call a market 'efficient' because the price reflects a consensus about the value of the security being traded—not necessarily because the price captures the true value of the firm's assets but because the price is the best available device to assess the significance of additional bits of information."  *Id.* at 1129–30.  Although "[t]he more thinly traded the stock, the less well the price reflects the latest pieces of information," even "inefficient" market prices "change in response to news, including statements by the issuers."  *Id.* at 1130.

The Supreme Court reinforced the centrality of loss causation in *Dura Pharmaceuticals*, noting that "[t]he securities statutes seek to maintain public confidence in the marketplace. . . .   But the statutes make these [private securities fraud] actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." 544 U.S. at 345. "A plaintiff is not required to show 'that a misrepresentation was the *sole* reason for the investment's decline in value' in order to establish loss causation.   '[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.'" *In re Daou Sys.*, 411 F.3d at 1025 (internal citation omitted) (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997) (emphasis added in *Daou*)).

Typically, "to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3d Cir. 2007).   Loss causation was adequately alleged, for instance, where investors claimed that a company had engaged in improper accounting practices and that the "stock fell precipitously after [the company] began to reveal figures showing the company's true financial condition." *In re Daou Sys.*, 411 F.3d at 1026 (explaining that "if the improper accounting did not lead to the decrease in Daou's stock price, plaintiffs' reliance on the improper accounting in acquiring the stock would not be sufficiently linked to their damages").   Courts

typically describe this sequence of events as the "fraud-on-the-market" scenario.  *See*, *e.g.*, *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007).

In the absence of a responsive market price, "the factual predicates of loss causation fall into less of a rigid pattern." *McCabe*, 494 F.3d at 426.  Addressing a Rule 10b-5 case concerning shares of a privately held company, we explained that "a comparison of market stock price to establish loss causation has less relevance because market forces will less directly affect the sales prices of shares of a privately held company." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1053 (9th Cir. 2011).  We observed that plaintiffs may nonetheless show loss causation by showing "that the revelation of the truth is directly related to the economic loss alleged." *Id.* (emphasis added).  Loss causation was therefore adequately alleged where a loss followed revelations that the company founders had been secretly selling their own shares in a privately held company. *Id.* at 1054; *see also McCabe*, 494 F.3d at 425–26.

Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.  The "materialization of the risk" approach, adopted by some circuits, recognizes loss causation where a plaintiff shows that "misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value" of a security. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 176–77 (2d Cir. 2005); *see also Ray*, 482 F.3d at 995. Although "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that

is concealed or misstated," materialization of the risk recognizes that "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Lentell*, 396 F.3d at 173. Under this theory, the plaintiff must show that "it was the very facts about which the defendant lied which caused its injuries." *McCabe*, 494 F.3d at 431 (internal quotation marks omitted).

Along similar lines, we have recognized that loss causation can be established by showing "that the Defendants' misrepresentation was directly related to the actual economic loss [the plaintiff] suffered." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 (9th Cir. 2005); *see also McCabe*, 494 F.3d at 434–36; *Emergent Capital*, 343 F.3d at 197. Put another way, a plaintiff can satisfy loss causation by showing that "the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss." *McCabe*, 494 F.3d at 425 (emphasis added).

These principles of loss causation are well established and Nuveen does not argue otherwise. Instead, Nuveen contends that its "but for" theory, which it conflates with the

materialization of the risk approach, satisfies loss causation.[2]
We disagree.

## B. NUVEEN'S "BUT FOR" THEORY

Nuveen takes the position that because the Notes would
not have been issued "but for" the City's fraudulent
misrepresentations, the loss causation requirement is
satisfied.  Only in its reply brief did Nuveen move beyond
this "but for" theory and claim that its position is "consistent
with 'the materialization of the risk' approach."[3]  Nuveen's

---

[2] Nuveen also maintains that the district court improperly required it to
prove loss causation by performing a "mathematical event study," a
statistical analysis that isolates fluctuations in stock price and is often
employed to show loss causation in the typical "fraud-on-the-market"
scenario involving publicly traded stocks.  The district court, however,
expressly stated that it "agree[d] with [Nuveen] that a traditional event
study is not feasible, given the type of 'market' here in which there were
very few trades."  Nuveen relied on the testimony of its expert, Dr. Sosa,
to try to show that the value of the Notes dropped after the City revealed
the truth by announcing its plan to sell the telecom system.  The district
court excluded the testimony, not because Dr. Sosa failed to perform a
mathematical study, but because he did not attempt to quantify the value
of the telecom system either at issuance or at sale or relate how any
specific misrepresentations or revelations impacted the value of the
system.  In its opening brief, Nuveen expressly abandoned reliance on
Sosa's theory that the sale notice served as a corrective disclosure that
caused the Notes' value to drop.

[3] In its opening brief, Nuveen nowhere referenced a "materialization of
the risk" theory.  It put forward such a theory before the district court,
which explicitly considered, and rejected, proof of loss causation under
the materialization of the risk standard.  *See In re Nuveen Funds/City of
Alameda Sec. Litig.*, C 08-4575 SI, 2011 WL 1842819, at *10 (N.D. Cal.
May 16, 2011) ("Plaintiffs' reliance on a 'materialization of the risk'
theory is also unavailing.").  We do not agree with Nuveen's position that
the district court's view on Nuveen's corrective disclosure evidence

effort to shoehorn its "but for" argument into the risk materialization construct finds no support in the case law. Although it is difficult to discern under which umbrella Nuveen seeks shelter, its bottom line remains the same—but for the fraud, the Notes would not have been marketed and Nuveen would not have suffered a loss.

We have consistently rejected loss causation arguments like Nuveen's—that a defendant's fraud caused plaintiffs a loss because it "induced them to buy the shares"—because the argument "renders the concept of loss causation meaningless by collapsing it into transaction causation." *McGonigle v. Combs*, 968 F.2d 810, 821 (9th Cir. 1992); *see also The Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1027 (9th Cir. 1999); *Ray*, 482 F.3d at 995 ("Although they try mightily to convince us otherwise, it seems to us that plaintiffs here are confusing loss causation . . . with transaction causation."). Nuveen's argument fails for the same reasons.

To show loss causation, Nuveen must demonstrate a causal connection between the alleged misrepresented risks in the Official Statement and the economic loss Nuveen suffered. This critical link is missing. Nuveen's expert testimony focuses instead on the proposition that the Notes would not have been "marketable" in 2004 had the City not inflated its projections of the system's performance. Nuveen invites the court to assume that the misrepresentations account for the entire difference between the 2008 sale price and the par value of the Notes, arguing that the Notes were "dead on arrival and preordained to fail" because the City

tainted the district court's analysis of the materialization of the risk theory. In any event, our review of this theory on appeal is de novo.

knew in 2004 that it would not be able to refinance the Notes at maturity.[4]

Nuveen's assertions that the Notes were "doomed" rests on a significant misapprehension. Contrary to Nuveen's assumption, the City's decision to sell the telecom system, rather than refinance the Notes for the long term, did not on its own cause an injury or economic loss to Nuveen. Nuveen's loss results from the decline in value of the Notes, as reflected in the sale price, not the fact of sale. Had Comcast purchased the system for the par value of the Notes, $33 million, Nuveen would not have suffered any economic loss at all.

In its reply brief, Nuveen suggests that the misrepresented risks "materialized" over time and caused the economic loss. Even if we credit this argument despite its emergence in the reply brief, Nuveen's evidence fails to create a triable issue

---

[4] Nuveen's focus on "marketability" bears resemblance to the "fraud-created-the-market" theory of transaction causation, recognized in some circuits, under which a "presumption of reliance is established where a plaintiff proves that the defendants conspired to bring to market securities that were not entitled to be marketed." *Malack v. BDO Seidman, LLP*, 617 F.3d 743, 747–48 (3d Cir. 2010) (internal quotation marks and alteration omitted). Because this is a *transaction* causation theory, it has no bearing on loss causation. The close similarity of Nuveen's argument highlights that Nuveen is in fact urging an improper merger of the two types of causation. Notably, even as a reliance theory, "fraud-created-the-market" has been criticized in many circuits and we have not accepted it in ours. *See Malack*, 617 F.3d at 748–49 (rejecting theory); *Eckstein*, 8 F.3d at 1130–31 (same); *see also Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 942 (9th Cir. 2009) (affirming district court's refusal to adopt "integrity of the market" presumption of reliance where manipulation "allegedly destroys the efficiency of the market, and with it the reliability of the market's price").

on this point.[5]  Nuveen focuses on alleged misrepresentations in the Official Statement regarding the system's access to apartment buildings, the success of competitors such as satellite television providers and Comcast, and growing programming expenses, and on evidence that the City inflated service-area and subscriber projections.  Nuveen's experts presented no opinions that these alleged misrepresentations masked the facts that resulted in Nuveen's economic loss.  Rather, the expert testimony targeted the reasonableness of the City's projections at the time the Notes were issued.  This left a gap between the alleged misrepresentations and a substantial cause of Nuveen's claimed loss—either the lower valuation or the City's inability to refinance the Notes when they came due—that cannot now be bridged by conjecture.

Rosston, Nuveen's economist, adjusted the April 2004 Official Statement's projections based on information in the City's March 2004 business plan, which he considered more reasonable.  Rosston's conclusion, that "[t]he projections in the Official Statement lacked a reasonable basis because they did not reflect the available information when the Official Statement was issued on April 8, 2004," did not bear on the system's valuation in 2008.  Garfunkel's expert opinion was similarly directed at the time of the Notes' issuance.  She concluded only that the Notes would not have been "marketable" in 2004 if the Official Statement had relied on the more reasonable projections in the March 2004 business

---

[5] The Ninth Circuit has not adopted the materialization of the risk approach, though district courts in the circuit have applied it.  *See, e.g.*, *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 12-CV-04115-JST, 2013 WL 4082011, at *11 (N.D. Cal. Aug. 9, 2013).  Given our conclusion that Nuveen fails to establish loss causation under its parameters, we need not decide whether to endorse the approach here.

plan.    Again, absent was testimony linking the 2004 projections to the economic loss in 2008.

We reject Nuveen's suggestion that the 2008 sale price reflects the reduction in value attributable to the alleged 2004 fraud.  For debt instruments like the Notes, Nuveen argues that a default, "result[s in] a situation where the value of the debt—which, in default, is reduced to the value of the collateral—reflects the results of the fraud before the fraud becomes known."  Nuveen analogizes its position to that of a mortgage lender, whose "only recourse . . . would be to recover as much of its initial investment as possible from the sale of the collateral for the Notes."  This argument fails to recognize that devaluation of collateral may be influenced by all sorts of factors unrelated to the reasons for the default.

Because there are a tangle of factors that affect refinancing and sale, evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors.  The Supreme Court succinctly summarized the reality of market conditions: a security's "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Dura Pharmaceuticals*, 544 U.S. at 343; *see also Schaaf*, 517 F.3d at 550 ("In a securities case, this standard requires the plaintiff to show that the defendant's fraud—and not other events—caused the security's drop in price.").    In a similar vein, the Tenth Circuit, for example, affirmed summary judgment for the defendants where the plaintiffs' expert's "theories of loss causation could not distinguish between loss attributable to

the alleged fraud and loss attributable to non-fraud related news and events." *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1132 (10th Cir. 2009). Like Nuveen's experts, the plaintiffs' expert "assumed that almost the entire decline in price was the result of the truth gradually leaking into the market, despite the fact that the decline in . . . share price closely correlated with the overall decline in the telecommunications industry as a whole." *Id.* at 1135.

Although Nuveen repeatedly promotes a different standard for Rule 10b-5 claims arising from "inefficiently traded" securities, the need to reliably distinguish among the tangle of factors affecting a security's price is no less urgent in inefficient markets. "[F]undamentally, the same loss causation analysis occurs in both typical and non-typical § 10(b) cases." *McCabe*, 494 F.3d at 425 n.2. In either case, whether a misrepresentation "was a substantial factor in causing . . . economic loss includes considerations of materiality, directness, foreseeability, and intervening causes." *Id*. at 436; *see also id.* at 436–37 (affirming summary judgment in favor of defendants where plaintiffs merely asserted that a company's breach of various contractual and registration agreements was "[a]mong the reasons for [the company's] failure to meet earnings and revenue targets" (internal quotation marks omitted)). These concerns apply to all covered securities transactions.

To be sure, the system did not perform as reportedly expected and the City's allegedly inflated projections were not in fact met. But it does not follow from the proposition that the Official Statement downplayed certain risks that those particular risks were substantially responsible for the economic loss Nuveen suffered. Had Nuveen shown that access to apartment buildings, success of competitors,

programming expenses, and inflated subscriber projections—the very facts the City allegedly misrepresented or omitted—were a substantial factor in causing its loss, it may have established a triable issue on loss causation. *See Livid*, 416 F.3d at 949; *McCabe*, 494 F.3d at 429. But Nuveen has presented no evidence on that score, and we decline its invitation to infer a connection. The City is entitled to summary judgment on the federal claims.

## II. IMMUNITY UNDER CALIFORNIA LAW

Nuveen's state law claims present a threshold question, namely, whether the City has immunity under California law. The California Corporate Securities Act provides for the liability of "any person" who willfully makes a false or misleading material statement for the purpose of inducing the sale of a security. Cal. Corp. Code §§ 25400, 25500. The law defines "person" to include "a government, or a political subdivision of a government." Cal. Corp. Code § 25013.

The California Tort Claims Act of 1963 (as amended and now referred to as the Government Claims Act)[6] provides public entity immunity and is arguably in tension with the general corporate code. Section 815 of the Government Claims Act prohibits holding a public entity liable "[e]xcept as otherwise provided by statute." Cal. Gov't Code § 815. Section 818.8 specifically immunizes public entities from liability "for an injury caused by misrepresentation by an employee of the public entity, whether or not such

---

[6] Consistent with the California Supreme Court, we "adopt the practice of referring to the claims statutes as the 'Government Claims Act,' to avoid the confusion engendered by the informal short title 'Tort Claims Act.'" *City of Stockton v. Superior Court*, 171 P.3d 20, 23 (Cal. 2007).

misrepresentation be negligent or intentional." Cal. Gov't Code § 818.8.

Nuveen takes the position that the California Corporate Securities Act expressly "provide[s] by statute," Cal. Gov't Code § 815, that a public entity is *not* immune by including public entities within the definition of "person[s]" that may be held liable for securities violations. Nuveen further argues that § 818.8 is inapplicable because it prohibits liability founded on employees' misrepresentations, whereas here the alleged misrepresentations in the Official Statement were made with the City's own imprimatur. The City maintains that the Government Claims Act, and in particular § 818.8, immunizes it from suit.

The City has the better argument. To begin, California courts have applied § 818.8 to immunize public entities from liability for their own misrepresentations, not only for misrepresentations by their employees. In *Jopson v. Feather River Air Quality Management District*, 133 Cal. Rptr. 2d 506 (Ct. App. 2003), for example, the court considered an action by a ranch owner alleging that a public entity was negligent in calculating certain pollution credits earned by the ranch. The public entity itself was "responsible for calculating, issuing, and registering" the credits. *Id.* at 507. The court held that § 818.8 barred the suit, relying on "a long line of California cases," including cases under § 818.8 that addressed allegations that the public entity itself had made misrepresentations. *Id.* at 510 (citing *Brown v. City of Los Angeles*, 73 Cal. Rptr. 364 (Ct. App. 1968), and *Hirsch v. Dep't of Motor Vehicles*, 115 Cal. Rptr. 452 (Ct. App. 1974)).

Nuveen has cited no contrary California case law that adopts the employee versus entity distinction it posits with

regard to § 818.8.  Although the text of § 818.8 refers to "misrepresentation by an employee of the public entity," the commentary conflates employees and entities, explaining that the "section provides public entities with an absolute immunity from liability for negligent or intentional misrepresentation."  Cal. Gov't Code § 818.8 (Legislative Committee Comments–Senate).  The California courts of appeal appear to have adopted this interpretation, *see, e.g.*, *Freeny v. City of San Buenaventura*, 157 Cal. Rptr. 3d 768, 778 (Ct. App. 2013) ("[I]t is well settled that section 818.8 confers upon public entities an absolute immunity for *all* misrepresentations . . . .") (emphasis in original), and we are not free to ignore their decisions.  "In the absence of a pronouncement by the highest court of a state, the federal courts must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently."  *Briceno v. Scribner*, 555 F.3d 1069, 1080 (9th Cir. 2009) (internal quotation marks omitted).  Application of § 818.8 to both employees and entities is not so illogical as to persuade us that the California Supreme Court would reject the approach.

Our decision that the City may properly invoke § 818.8 does not resolve its liability completely.  We must consider the additional question of whether this immunity should prevail in the face of the provisions of the California securities law.  That these are separate questions is highlighted by *Janis v. California State Lottery Commission*, 80 Cal. Rptr. 2d 549 (Ct. App. 1998).  There, the court found that § 818.8 barred *common law* claims that the California State Lottery had misrepresented the legality of the game Keno.  *See id.* at 552.  But it separately considered whether the plaintiff could maintain *statutory* claims under California's Unfair Practices Act.  Because that Act did not

include governmental entities in the definition of "persons" to which the statute applied, the court concluded the claims failed as a matter of law. *Id.* at 553; *see also Trinkle v. California State Lottery*, 84 Cal. Rptr. 2d 496, 498 (Ct. App. 1999) (same).

Unlike the Unfair Practices Act, the California Corporate Securities Act includes governmental entities in the definition of persons liable. Cal. Corp. Code § 25013. This inclusion may be necessary to abrogate immunity, but is it sufficient? Both the structure of the Government Claims Act and the case law persuade us that it is not. Although no published decisions have considered the precise immunity question presented here, other California case law interpreting the Government Claims Act suggests that the specific immunity provision of § 818.8 overrides the liability provision in the securities statute because the statute does not expressly withdraw such immunity.

The Government Claims Act was enacted after the California Supreme Court had largely abrogated common law governmental immunity. The Court explained that the "intent of the Act is not to expand the rights of plaintiffs in suits against governmental entities or employees, but to confine potential governmental liability to rigidly delineated circumstances: immunity is waived only if the various requirements of the Act are satisfied." *Caldwell v. Montoya*, 897 P.2d 1320, 1328 (Cal. 1995) (internal quotation marks and alterations omitted).

Section 815 establishes the analytical approach for determining liability and applicable immunities:

> Except as otherwise provided by statute:
>
> (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.
>
> (b) *The liability of a public entity established by this part* (commencing with Section 814) *is subject to any immunity of the public entity provided by statute, including this part*, and is subject to any defenses that would be available to the public entity if it were a private person.

Cal. Gov't Code § 815 (emphasis added). According to subsection (a), the general rule provides for governmental immunity unless a statute provides otherwise. According to subsection (b), even if liability is established by statute, that liability is subject to the various specific governmental immunities set forth in the Government Claims Act or elsewhere. The commentary to the section accordingly explains that "the immunity provisions will as a general rule prevail over all sections imposing liability." *Id.* (Legislative Committee Comments–Senate). One such liability-imposing section is the California corporate securities law. However, "the general rule is that the governmental immunity will override a liability created by a statute outside of the [Government] Claims Act." *Gates v. Superior Court*, 38 Cal. Rptr. 2d 489, 506 (Ct. App. 1995); *see also Clark v. Optical Coating Lab., Inc.*, 80 Cal. Rptr. 3d 812, 843 (Ct. App. 2008)

("The [Government] Claims Act governs *all* liability against public entities in California.") (emphasis added).[7]

To rebuff this general rule, a liability-creating statute must clearly withdraw statutory immunities. The California Supreme Court articulated this clarity requirement in *Caldwell*, which considered whether public employees could be held liable under the state's Fair Employment and Housing Act ("FEHA").[8] FEHA's imposition of a general duty and liability on public employees did not override immunity for discretionary acts under Cal. Gov't Code § 820.2. Discussing FEHA, the court explained:

> Such a statute may indeed render the employee liable for his violations unless a specific immunity applies, but it does not remove the immunity. This further effect can only be achieved by a *clear indication* of legislative intent that statutory *immunity* is *withheld* or *withdrawn* in the particular case.

---

**7** Nuveen mischaracterizes the relationship between § 815 and the subsequent statutory immunities. In arguing that "Section 818.8 may be 'absolute' within the confines of Section 818.8, but does not trump Section 815," Nuveen claims that wherever liability is "provided by statute," § 815, all specific immunities fall away. This argument ignores subsection (b) of § 815, which expressly subjects liability to subsequent immunities.

**8** FEHA made it unlawful for any covered "employer" to engage in certain employment discrimination and permitted suits for violations of the act; the act provided that an "employer" includes "any person acting as [the employer's] . . . agent" and also made it unlawful for "any person" to aid or abet violations of the act. *Caldwell*, 897 P.2d at 1324 n.3.

*Caldwell*, 897 P.2d at 1329 (first emphasis added).  The court emphasized that FEHA is a general statute that governs both public and private employers and displays no special emphasis on public employees.  *Id.*

The *Caldwell* decision did not explain what exactly a "clear indication" would look like.  However, in a footnote, the court discussed previous cases that had implicitly found such an indication in a whistle-blower protection statute. That statute "subjected 'any' state 'officer or employee' to direct civil liability" for retaliating against whistle-blowers, ostensibly overriding the asserted statutory governmental immunities.  *Id.* at 1329–30 n.7 (citing *S. Cal. Rapid Transit Dist. v. Superior Court*, 36 Cal. Rptr. 2d 665 (Ct. App. 1994), and *Shoemaker v. Myers*, 4 Cal. Rptr. 2d 203 (Ct. App. 1992)).   The court highlighted the "specific nature and purpose" of whistle-blower protection statutes, which have as their "core statutory objective[]" the prevention of government misconduct.   The court distinguished this essentially government-focused scheme from FEHA, which "promotes much more general policies throughout the public and private sectors and advances no specifically *governmental* interest that would support a finding of intent to abrogate any immunity of public employees."  *Id.* at 1330 n.7 (emphasis original).   Following this approach, the California Corporate Securities Act is more akin to FEHA than it is to the whistle-blower statute.  Nuveen has cited no legislative history or other authority, and we are aware of none, showing that any particular concern with municipal liability underlay the state securities law.

The *DeJung* decision invoked by Nuveen does not support the proposition that the inclusion of governmental entities in the definition of "person" is sufficient evidence of

intent to abrogate immunities.  The California Court of Appeal concluded there that FEHA's similar definitional scheme expressly subjected a public employer to liability for discrimination.  *DeJung v. Superior Court*, 87 Cal. Rptr. 3d 99, 106–07 (Ct. App. 2008).  Critically, however, the court did not consider that liability in the face of a properly invoked statutory immunity.  Rather, the court rejected the public employer's argument that it was shielded by the § 820.2 discretionary act immunity for public *employees*, reasoning that the statutory liability asserted against the employer was not derivatively based on employees' actions but directly based on the employer's own actions.  The employer therefore had no basis for invoking the Government Claims Act's provision on vicarious liability and immunity, which provides that, "[e]xcept as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."  *Id.* at 106 (citing Cal. Gov't Code § 815.2(b)).

Here, by contrast, the City properly invoked immunity under § 818.8.  Despite that provision's nominal reference to employees, California case law permits public entities to rely directly on the grant of immunity for their own misrepresentations.  After considering the intersection between the Government Claims Act and the California Corporate Securities Act, we conclude that the City enjoys immunity from suit and is entitled to summary judgment on Nuveen's state claims.

## III.    DEFENSE COSTS

The City cross-appeals the denial of its motion for defense costs.  Under California law, "applicable defendants

may recover defense costs . . . if the trial court finds the plaintiffs lacked *either* reasonable cause or good faith in filing or maintaining the lawsuit." *Kobzoff v. Los Angeles Cnty. Harbor/UCLA Med. Ctr.*, 968 P.2d 514, 516 (Cal. 1998); Cal. Code Civ. Proc. § 1038(a).

The district court noted that the City raised "some forceful arguments" in its § 1038 motion but ultimately determined that there "is no basis in the record to conclude that [the] claims presentment arguments were brought in bad faith or without reasonable cause." The main complaint in the City's cross-appeal is that the court did not individually address each of its arguments for defense costs. In fact, the order provides considerable detail as to the court's reasoning and nothing requires the district court to respond to each argument tit-for-tat or in explicit detail. Indeed, this court "infer[s] from the court's denial of the City's motion that it made the determinations necessary to support its order." *Laabs v. City of Victorville*, 78 Cal. Rptr. 3d 372, 397 (Ct. App. 2008).[9]

Reasonable cause is "defined under an objective standard as whether any reasonable attorney would have thought the

---

[9] Relying on Federal Rules of Civil Procedure 52(a)(1) and 54(d)(2)(C), the City argues that "whatever the rule may be in state courts, the rules applicable in federal courts . . . *require* specific findings of fact." These authorities are inapposite. Rule 52(a)(1) governs findings in *bench trials*. Rule 52(a)(3), governing *motions*, provides "[t]he court is *not required* to state findings or conclusions when ruling on a motion under Rule 12 or 56 *or, unless these rules provide otherwise, on any other motion*." Fed. R. Civ. P. 52(a)(3) (emphasis added). Rule 54(d)(2)(C) merely requires courts considering motions for attorney's fees to proceed in accordance with Rule 52(a), where, as noted, the applicable subsection is (a)(3) rather than (a)(1). Fed. R. Civ. P. 54(d)(2)(C).

claim tenable." *Kobzoff*, 968 P.2d at 518 (internal quotation marks omitted).[10]   The City's reasonable cause argument focuses on the propriety of allegations in Nuveen's First Amended Counterclaim, specifically the allegation that Alameda pressured Uptown to revise the projections included in the Official Statement.   Regardless of this particular allegation, a reasonable lawyer could "have thought the claim[s] tenable" when they were asserted. *Kobzoff*, 968 P.2d at 518.   While the City characterizes the assertedly false allegation as "key" to the claims, Nuveen's claims relied on a far broader set of allegations and do not rise or fall on the veracity of the Uptown projection allegation.  We agree with the district court that Nuveen had reasonable cause to maintain its claims.

"Good faith, or its absence, involves a factual inquiry into the plaintiff's subjective state of mind."  *Clark*, 80 Cal. Rptr. 3d at 843 (emphasis and internal quotation marks omitted). The district court, which lived with this case from 2008 until judgment in 2011, found no support in the record for the City's claims that Nuveen acted in bad faith.  The court was well acquainted with the City's concerns about the adequacy of Nuveen's discovery responses and disclosures about its theory of the case.  The focus of the good faith inquiry for defense costs is a party's honest belief in the viability of the claims, *see Laabs*, 78 Cal. Rptr. 3d at 397, and the record

---

[10] Although we generally review fee decisions under state law for abuse of discretion, *see Champion Produce, Inc. v. Ruby Robinson Co.*, 342 F.3d 1016, 1020 (9th Cir. 2003), in keeping with California law and giving the City the benefit of the doubt, we review de novo the objective determination of reasonable cause. *Hall v. Regents of Univ. of California*, 51 Cal. Rptr. 2d 387, 390 (Ct. App. 1996).

amply suffices to support the district court's finding that Nuveen had such a belief.

   **AFFIRMED.**