[No. C041927. Third Dist. May 2, 2003.]

WESLEY JOPSON et al., Plaintiffs and Appellants, v.
FEATHER RIVER AIR QUALITY MANAGEMENT DISTRICT,
Defendant and Respondent.

**COUNSEL**

Rodi, Pollock, Pettker, Galbraith & Cahill, C. Stephen Davis and Andrew W. Bodeau for Plaintiffs and Appellants.

Daley & Heft, Richard J. Schneider and Scott E. Patterson for Defendant and Respondent.

**OPINION**

**RAYE, J.**—Because of a miscalculation, the Feather River Air Quality Management District (the District) banked and issued the Jopson Ranch (Jopson) 470 tons of marketable pollution credits more than it actually had earned for reducing agricultural burning.

Section 818.8 of the Government Code (section 818.8) grants the government the following immunity: "A public entity is not liable for an injury

caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional." The trial court concluded that the misrepresentation immunity provided by section 818.8 protected the District from any liability to Jopson arising from the miscalculation. The court therefore granted the District's motion for summary adjudication. We affirm.

## FACTS

In California, the right to pollute the air can be bought and sold. Air quality management districts have created a valuable commodity, the emission reduction credit (ERC). The ERC is evidenced by transferable certificates approved, banked, and issued by the districts. Simply put, a polluter who pollutes less can sell the ERC to allow the purchaser to pollute more. Because open-air burning of rice straw generates tons of airborne pollutants, the Connelly-Areias-Chandler Rice Straw Burning Reduction Act of 1991 (the Act) provides ERC's to farmers in an attempt to reduce emissions. (Health & Saf. Code, § 41865.)

On February 19, 1996, Jopson applied for ERC's for reducing wheat, rice straw, and weed burning on six parcels of land in Sutter County. Under the Act, the District is responsible for calculating, issuing, and registering the ERC's. The ERC calculation involves a number of factors, including fuel loading factors. The loading factor reflects the quantity of refuse burned per unit of land area and must match the type of vegetation that is the subject of the ERC application. The District calculated Jopson's ERC's, gave the required notices, and, after receiving no objections, banked the ERC's on behalf of Jopson.

By September 25, 1998, Jopson had agreed to sell its ERC's for $1.143 million. Shortly thereafter, the District reduced the number of ERC's at Jopson's request, with a commensurate reduction in price. The prospective buyer applied to the California Air Resources Board (CARB) to use the ERC's. CARB concluded the District had either misidentified the type of vegetation on the property or applied an incorrect loading factor and notified the District of the calculation error.

The District recalculated the ERC's using the "weeds" rather than the "wildland" loading factor. As a result of correcting the District's calculation errors by utilizing appropriate loading factors for weeds, Jopson's total ERC's were reduced from 615.60 tons to 144.72 tons, a total reduction of

■■■

470.88 tons, or more than 75 percent. The reduction meant a reduction in the purchase price of $831,360.65.

The District rules allow ERC certificates to be changed, after notice and public hearing, to adjust the quantity of banked ERC's without the owner's consent. The District, after recalculating the ERC's, asked Jopson to voluntarily surrender its ERC certificate. Jopson complied, completed the sale, and then sued the District for negligence.

The parties filed cross-motions for summary adjudication. The trial court granted the District's motion on the sole ground that the governmental misrepresentation immunity affirmative defense disposed of Jopson's single cause of action for negligence. We independently review the application of the immunity law to the undisputed facts presented in the motion for summary adjudication. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].)

## DISCUSSION

■ Section 818.8 grants public entities immunity for negligent misrepresentation but not for negligence. Distinguishing between the two torts has spawned an eclectic assortment of state and federal cases. Jopson directs us to review the "gravamen of the complaint" to determine whether the essence of the claim is for misrepresentation or for negligence. While Jopson insists that assessing the "gravamen of the complaint" test has been impliedly adopted by California courts, it urges us to expressly adopt the federal standard. Moreover, Jopson maintains that the District's calculation of ERC's involved an "operational task" giving rise to a cause of action in negligence and not the communication of information, which would have involved a misrepresentation claim.

The District, however, argues that the "gravamen of the complaint" and "operational task" tests are mere euphemisms for negligence, and while both have been utilized in federal cases, they create a distinction "so ephemeral that liability would swallow the immunity." The District insists that neither approach is, or should be, the law in California.

The term "misrepresentation," as used in section 818.8, "potentially lends itself to extremely expansive and elusive interpretations." (*Johnson v. State of California* (1968) 69 Cal.2d 782, 799 [73 Cal.Rptr. 240, 447 P.2d 352]

(*Johnson*).) The cases cited by both sides simply reflect the elasticity of the term and the somewhat less-than-clear line of demarcation between a claim of negligence, for which there is no immunity, and a claim of negligent misrepresentation, for which there is.

In *Johnson*, the California Supreme Court avoided the potential quagmire posed by too broad a definition of misrepresentation by focusing on the Legislature's goal to exempt public entities in those cases in which private defendants typically face liability for misrepresentation. "In short, 'misrepresentation,' as a tort distinct from the general milieu of negligent and intentional wrongs, applies to interferences with financial or commercial interest. The Legislature designed section 818.8 to exempt the governmental entity from this type of liability." (*Johnson, supra*, 69 Cal.2d at p. 800.)

In *United States v. Neustadt* (1961) 366 U.S. 696 [81 S.Ct. 1294, 6 L.Ed.2d 614] (*Neustadt*), the United States Supreme Court rejected the notion that the federal immunity statute (28 U.S.C. § 2680(h)) did not apply "when the gist of the claim lies in *negligence* underlying the inaccurate representation . . . ." (*Neustadt, supra*, 366 U.S. at p. 703 [81 S.Ct. at p. 1298, 6 L.Ed.2d at p. 619].) "To say, as the Fourth Circuit did, that a claim arises out of 'negligence,' rather than 'misrepresentation,' when the loss suffered by the injured party is caused by the breach of a 'specific duty' owed by the Government to him, i.e., the duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his economic affairs, is only to state the traditional and commonly understood legal definition of the tort of 'negligent misrepresentation,' . . . ." (*Id.* at p. 706 [81 S.Ct. at p. 1300, 6 L.Ed.2d at p. 621].)

Yet, as Jopson emphasizes, the United States Supreme Court later distinguished *Neustadt* in *Block v. Neal* (1983) 460 U.S. 289 [103 S.Ct. 1089, 75 L.Ed.2d 67] (*Block*) by undertaking a review of the gravamen of the complaint. "As we recognized in [*Neustadt*], the essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies. The gravamen of the action against the Government in *Neustadt* was that the plaintiff was misled by a 'Statement of FHA Appraisal' prepared by the Government. Neustadt alleged no injury that he would have suffered independently of his reliance on the erroneous appraisal. . . . [¶] . . . [¶] In this case, unlike *Neustadt*, the Government's misstatements are not essential to plaintiff's negligence claim." (*Id.* at pp. 296-297 [103 S.Ct. at pp. 1093-1094, 75 L.Ed.2d at pp. 74-75].)

Similarly, a state Court of Appeal also considered the gravamen of the action in finding that immunity shielded the government in *Tokeshi v. State*

of California (1990) 217 Cal.App.3d 999 [266 Cal.Rptr. 255] (*Tokeshi*). "Regardless of the way plaintiffs couch their allegations, the gravamen of their action, pure and simply, is that they suffered injuries purportedly caused by their reliance on [the government's] misinformation." (*Id.* at p. 1008.)

Thus, misrepresentation does indeed lend itself to expansive and elusive interpretations. But the problem is more academic than real. The District vehemently resists scrutiny of the gravamen of the complaint as utilized in the federal cases. We, however, do not see a significant chasm between the state and federal cases, nor do we find that a gravamen test makes the misrepresentation immunity any less elusive to define. Jopson, on the other hand, suggests that distinguishing operational tasks from communication of information clarifies the scope of the immunity. We disagree.

Obviously, every tort of "negligent misrepresentation" involves both negligence and misrepresentation. In *Guild v. United States* (9th Cir. 1982) 685 F.2d 324 (*Guild*), the Ninth Circuit Court of Appeals held that the "key distinction in this area is between the performance of operational tasks and the communication of information. The Government is liable for injuries resulting from negligence in performance of operational tasks even though misrepresentations are collaterally involved. It is not liable, however, for injuries resulting from commercial decisions made in reliance on government misrepresentations." (*Id.* at p. 325.) We do not find the identification of operational tasks any less elusive than distinguishing between negligent misrepresentation and negligence.

This academic exercise is, in the end, much ado about nothing. While the articulation of an easy formula may prove difficult, the facts of the state and federal immunity cases provide clear guidance. Indeed, the facts of the relevant cases, not the jurisdiction in which they were decided, offer the needed template for deciding the case now before us.

Cases finding immunity trace their genesis to *Neustadt, supra,* 366 U.S. 696 [81 S.Ct. 1294, 6 L.Ed.2d 614]. In *Neustadt,* an appraiser for the Federal Housing Administration (FHA) visited and inspected a single-family home. Based on that inspection, the FHA assigned an appraised value of $22,750 and approved mortgage insurance based on the appraised value. The Neustadts relied on the FHA appraisal in purchasing the property for $24,000, but within a few months they discovered substantial defects in the house. (*Id.* at pp. 698-700 [81 S.Ct. at pp. 1296-1297, 6 L.Ed.2d at pp. 617-618].) In their

complaint against the FHA, they alleged that the inspection had been conducted negligently. (*Id.* at p. 700 [81 S.Ct. at p. 1297, 6 L.Ed.2d at p. 618].) The district court rejected the government's immunity defense, and the judgment for the plaintiffs was affirmed on appeal. (*Id.* at p. 701 [81 S.Ct. at p. 1297, 6 L.Ed.2d at p. 618].) Both courts held that the misrepresentation of the house's value was " 'merely incidental' to the 'gravamen' of the claim, i.e., 'the careless making of an excessive appraisal so that [respondents were] . . . deceived and suffered substantial loss.' " (*Id.* at p. 704 [81 S.Ct. at p. 1299, 6 L.Ed.2d at p. 620].) The Supreme Court reversed, rejecting the lower courts' fine-spun distinctions between negligence and misrepresentation. (*Id.* at p. 711 [81 S.Ct. at pp. 1302-1303, 6 L.Ed.2d at p. 624].)

The District relies on a long line of California cases following *Neustadt.* In each case, the plaintiff, as here, couched his allegations as a claim for either intentional misconduct or negligence, not misrepresentation. In *Brown v. City of Los Angeles* (1968) 267 Cal.App.2d 849, 850-851 [73 Cal.Rptr. 364] (*Brown*), the complaint alleged that the city negligently told a business owner to discontinue her businesses because they violated zoning ordinances. They did not. In *Hirsch v. Department of Motor Vehicles* (1974) 42 Cal.App.3d 252, 254-255 [115 Cal.Rptr. 452] (*Hirsch*), the complaint alleged that the Department of Motor Vehicles negligently and carelessly issued the purported owner of an automobile a certificate of ownership without the proper documentation and negligently and carelessly failed to require the owner to file an undertaking or bond. The car had been stolen. In *Grenell v. City of Hermosa Beach* (1980) 103 Cal.App.3d 864, 867-868 [163 Cal.Rptr. 315] (*Grenell*), the complaint alleged that the city issued an erroneous report indicating property was zoned for rental use when it was not. *Harshbarger v. City of Colton* (1988) 197 Cal.App.3d 1335 [243 Cal.Rptr. 463] (*Harshbarger*) adds a more egregious twist. In *Harshbarger*, the complaint alleged that city building inspectors intentionally signed a document indicating a residence met applicable building codes when the inspectors knew it did not. (*Id.* at p. 1342.) And finally, in *Tokeshi, supra*, 217 Cal.App.3d 999, the plaintiffs alleged that a state inspector gratuitously instructed farmers to spray their crop with a pesticide that exceeded the permissible tolerance. (*Id.* at p. 1002.) They were later prohibited from harvesting and selling their crop. (*Ibid.*)

Citing *Neustadt*, the courts unanimously rejected the plaintiffs' attempts to evade the public entities' immunity defense provided under section 818.8 by characterizing the misconduct as something other than intentional or negligent misrepresentation. Essential to each claim was the plaintiff's reliance upon misinformation communicated to him by the government.

Jopson, in reply, makes a gallant effort to distinguish these cases, arguing that they address simple misrepresentations of existing facts as opposed to negligent performance of the technical operational tasks of identifying, calculating, and banking ERC's. Not so. The public entities in *Brown, Hirsch, Grenell, Harshbarger,* and *Tokeshi* did not simply act as conduits of information. In each case, the public entity took preliminary steps to ascertain information but, in doing so, either wrongfully or negligently obtained false information. They either misapplied their own ordinances and rules to the relevant factual scenarios or failed to process applications properly. The same is true here. The District, by using an erroneous loading factor, also obtained false information. Like an inflated appraisal, an erroneous building inspection, a mistaken certificate of ownership, a false zoning report, or ill-advised instructions, the miscalculation of the ERC's constituted misinformation communicated by a governmental entity. The miscalculation may have preceded the communication, but based on analogous facts in the cases cited above, we conclude the District is shielded from liability for having misrepresented the true (and indeed existing) fact that Jopson had earned but a small percentage of the ERC's it was issued.

The facts of the cases cited by Jopson bear little, if any, resemblance to the facts before us. *Johnson, supra,* 69 Cal.2d 782, the seminal California case on section 818.8 immunity, involved placement of a foster child who had homicidal tendencies. The Supreme Court held the state did not have immunity because the purported negligent misrepresentation did not interfere with financial or commercial interests. The social service case is utterly inapposite.

In *Block, supra,* 460 U.S. 289 [103 S.Ct. 1089, 75 L.Ed.2d 67]; *Guild, supra,* 685 F.2d 324; *National Carriers, Inc. v. United States* (8th Cir. 1985) 755 F.2d 675 (*National Carriers*); and *Neal v. Bergland* (6th Cir. 1981) 646 F.2d 1178 (*Neal*), various public entities became actively involved in either designing, planning, supervising, inspecting, or directing projects or activities. In *Block,* the Farmers Home Administration supervised and inspected a low income housing project (*Block, supra,* 460 U.S. at p. 290 [103 S.Ct. at p. 1090, 75 L.Ed.2d at p. 70]); in *Guild,* the Soil Conservation Service of the United States Department of Agriculture designed and helped plan a dam and reservoir (*Guild, supra,* 685 F.2d at p. 324); in *Neal,* the Farmers Home Administration supervised and inspected the construction of a prefabricated house (*Neal, supra,* 646 F.2d at p. 1179); and in *National Carriers,* government inspectors became actively involved in the separation of meat exposed to ditch water at an accident site (*National Carriers, supra,* 646 F.2d at p. 676). Each involved an alleged breach of duty arising from governmental conduct completely divorced from any attendant communication.

The Ninth Circuit aptly described the distinction in *Guild, supra,* 685 F.2d 324 as follows: "If [the Soil Conservation Service] had merely provided the Guild with information that it had gathered, and if the Guild had relied on that information to its detriment, then *Neustadt . . .* would control. In that situation the essence of the complaint would be the reliance upon misinformation communicated by the Government. The facts here, however, are significantly different. In our case the Government engaged in a species of engineering malpractice. It undertook the design and planning for the dam and reservoir. Designing the dam and reservoir was an operational task and the Government performed it negligently. Any communication of misinformation was collateral. The misrepresentation exception does not apply on these facts because the essence of the complaint is one for failure to take due care in the performance of a voluntary task." (*Id.* at p. 326.)

Similarly, in *Block, supra,* 460 U.S. 289 [103 S.Ct. 1089, 75 L.Ed.2d 67], the Supreme Court affirmed the Sixth Circuit Court of Appeals, which held that the gravamen of the complaint was "based not on misrepresentation, as in the issuance of a false or inaccurate appraisal report, but rather on [the Farmers Home Administration's] failure to use due care in a voluntary undertaking, i.e., inspection and supervision of the construction of [plaintiff's] house. Congress, we believe, intended plaintiff to be the beneficiary of the inspection and technical assistance offered by [the Farmers Home Administration]." (*Neal, supra,* 646 F.2d at p. 1184.)

Struggling mightily to fit the template of these cases, Jopson asserts that the District's miscalculation is analogous to "engineering malpractice." It characterizes the calculations as an "operational task" the government performed negligently. Jopson concedes that the cases contemplate consideration of the scope of the governmental activity involved and, as if to enlarge the scope of the District's activity, it italicizes the individual steps the District undertook. Instead of characterizing the District's error as a miscalculation, Jopson insists the District had a duty to "*identify,*" "*calculate,*" and "*bank*" the ERC's. Jopson's hyperbole does not convert the miscalculation into "an operational task" of the scope illustrated in the cases it cites.

We simply cannot say that the mathematical calculation of ERC's is equivalent to designing a dam or supervising the construction of a house. The inflated calculation, like the inflated appraisal in *Neustadt,* misrepresented the true value of Jopson's interest, but there is something fundamentally and qualitatively different about calculating or appraising value that does not change the actual value of the real estate, ERC's, etc. and actively

participating in conduct that does. Consequently, in each of the cases cited by Jopson, the governmental entity became integrally involved in causing the plaintiff's damage, not merely by inflating the plaintiff's expectations. We conclude that although the District's miscalculation temporarily raised Jopson's expectations that it might enjoy an undeserved windfall, it did not constitute a type of "engineering malpractice." Like the faulty appraisal in *Neustadt*, the miscalculation was part of the misrepresentation shielded by the governmental immunity provided by section 818.8.[1]

Jopson would have us reject *Neustadt* and its progeny and apply the aberrational logic utilized by the two-justice majority in *Connelly v. State of California* (1970) 3 Cal.App.3d 744 [84 Cal.Rptr. 257] (*Connelly*). The facts in *Connelly* may be compelling, but the majority's analysis of the immunity defense is not.

In *Connelly*, an owner of three marinas located at the confluence of two rivers brought an action against the Department of Water Resources to recover business losses incurred as a result of the department's voluntary dissemination of inaccurate river height forecasts. (*Connelly, supra,* 3 Cal.App.3d at pp. 746-747.) The majority found that "although [the owner] suffered a commercial loss in the sense that his business installations were damaged, the loss did not result from a commercial transaction between him and the state, nor from the state's interference with his commercial transactions. The complaint alleges a service gratuitously performed by the state in a negligent manner, resulting in physical damage to property. As there is no allegation of a tortious interference by the state with [the owner's] commercial activities within the rationale of *Johnson*, we conclude that section 818.8 does not apply to this case." (*Connelly, supra,* 3 Cal.App.3d at p. 752.)

The dissent concluded that the causes of action for misrepresentation and negligent misrepresentation are embraced within the immunities afforded by section 818.8. (*Connelly, supra,* 3 Cal.App.3d at pp. 762-763 (dis. opn. of David, J.).) The *Tokeshi* court's criticism was more to the point. That court wrote, "In our view, by focusing on the negligent manner by which the

---

[1]Jopson also cites cases that involved nonessential communications but are unprotected by section 818.8. (*Sava v. Fuller* (1967) 249 Cal.App.2d 281 [57 Cal.Rptr. 312]; *Wheeler v. County of San Bernardino* (1978) 76 Cal.App.3d 841 [143 Cal.Rptr. 295]; *In re Glacier Bay* (9th Cir. 1995) 71 F.3d 1447.) These cases involve discretionary immunity, not misrepresentation immunity. Because we conclude the District is shielded by the immunity provided by section 818.8, we need not consider the District's alternative argument on appeal that it was entitled to immunity for the discretionary acts of its employees. For this reason, we deny Jopson's request to take judicial notice of the March 2001 status conference statement.

public agency derived its forecast—instead of examining the statement itself—the *Connelly* majority created an artificial distinction which we decline to follow." (*Tokeshi, supra,* 217 Cal.App.3d at p. 1008.)

Jopson contends that the inquiry whether a public entity has interfered with a plaintiff's commercial or financial interest only arises if the court determines the claim is based on a misrepresentation. We agree. But *Connelly* unduly restricts governmental immunity by narrowly construing what constitutes both a misrepresentation and a commercial interest. In both aspects, the *Connelly* majority stands alone.

Like the court in *Tokeshi,* we reject *Connelly*'s application of section 818.8. In our opinion, the court in *Connelly* misconstrued *Johnson* and overlooked *Neustadt.* In *Johnson,* the Supreme Court distinguished misrepresentations made in the context of the delivery of social services from those representations that interfere with financial or commercial interests. (*Johnson, supra,* 69 Cal.2d at p. 800.) The Supreme Court did not suggest, as did the court in *Connelly,* that the plaintiff's loss must have resulted from a commercial transaction with the state. Rather, the public entity's representation need only "interfere" with the plaintiff's financial or commercial interests. (*Ibid.*) As this case, as well as *Grenell, Hirsch, Harshbarger,* and *Tokeshi,* illustrates, it is quite possible to interfere with a party's financial or commercial interests without being directly involved in a commercial transaction.[2]

Nor do we accept Jopson's argument that the District is not entitled to immunity because it was engaged in a regulatory process and not a commercial transaction. The revision of the miscalculation led to a drastic reduction in the sales price of Jopson's ERC's. Nonetheless, for purposes of reviewing the applicability of the immunity defense, we conclude that the District's misrepresentation interfered with Jopson's financial interest, causing, as it did, a large loss in the sales price. To suggest, as Jopson does, that the financial implications are irrelevant because the District was performing its statutory duty to implement a regulatory scheme would create a judicial loophole in the statutory immunity defense. This we cannot do.

---

[2]We deny Jopson's request to take judicial notice of two pages of the state respondent's brief filed in 1968 in the *Connelly* case. Whether the Court of Appeal considered the plaintiff's business losses is immaterial. The court found that the plaintiff's loss must have resulted from a commercial transaction with the state. (*Connelly, supra,* 3 Cal.App.3d at p. 752.) We disagree with the majority's contraction of the immunity defense for the reasons discussed above.

## Disposition

The judgment is affirmed.

Davis, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied June 2, 2003, and the opinion was modified to read as printed above.