HULL, J.,
Concurring and Dissenting.—I concur in part I of the opinion; as to part II, I dissent.
The majority concludes the cap-and-trade auction program is not a tax because (1) the purchase of auction credits by businesses is voluntary, (2) the purchasing entities receive “a thing of value” in the nature of a commodity by their purchase, that is, the right to pollute the air and (3) we need not be concerned in this appeal about the use of the auction proceeds.
On this record, (1) the purchase of auction credits by Morning Star Packing Company (Morning Star) or other businesses similarly situated is not voluntary, (2) the auction credits do not confer property rights in the nature of a commodity or otherwise to Morning Star or businesses who are similarly situated, and (3) the use of the auction proceeds, a hallmark, if not the gold standard, for determining if a state exaction is a tax must be considered.
I conclude that the cap-and-trade auction program is a tax, therefore, I dissent.
Preliminarily, the majority begins its analysis by circumscribing for our purposes our Supreme Court’s holding in Sinclair Paint Co. v. State Bd. of Equalization (1997) 15 Cal.4th 866 [64 Cal.Rptr.2d 447, 937 P.2d 1350] *653 (Sinclair Paint) insofar as that holding relates to the case we are now considering. I agree that Sinclair Paint is of limited use (but not of no use) in deciding the issue before us. Sinclair Paint decided that the state exaction there at issue was a regulatory fee and not a tax, whereas all parties to these appeals seem to agree that the auction program is not a regulatory fee. Appellants contend that the auction program is not a regulatory fee and, if it is not a fee, it must therefore be a tax. Respondents, when questioned on that point during oral argument, took the position that the cap-and-trade auction proceeds are not a fee but are “something else.” And indeed, respondents cannot take any other position on this point because Sinclair Paint describes a “regulatory fee[]” as one that was made “ ‘ “in connection with regulatory activities which fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and ... not levied for unrelated revenue purposes.” ’ ” (Id. at p. 876, quoting Pennell v. City of San Jose (1986) 42 Cal.3d 365, 375 [228 Cal.Rptr. 726, 721 P.2d 1111].) Respondents cannot possibly fit the auction program within Sinclair Paint’s formulation of a regulatory fee.
Thus, the issue before the court is whether this “something else” is in fact a tax.
I

Voluntariness

Turning then to the question of the “voluntariness” of participating in the auction program, the only evidence in the trial court and the only evidence in this record on the question of voluntariness is the declaration of Janet Rabo, an economist with appellant, Morning Star. Ms. Rabo declared, in pertinent part, as follows:
“I am an economist with The Morning Star Packing Company (Morning Star), and I am authorized to sign this declaration on its behalf: My job duties include economic and statistical analysis for Morning Star’s business enterprises, including analysis of data in connection with domestic tomato processing plants and farming operations, as well international economics affecting Morning Star’s businesses. One of my key responsibilities is to ensure that Morning Star is in compliance with all aspects of AB 32, and its implementing regulations, including the Cap and Trade Regulation governing emissions of greenhouse gases. This includes registering Morning Star as a Covered Entity, participating in state-run auctions, estimating Morning Star’s compliance obligations for each compliance period, bidding on and purchasing emissions allowances at auctions to meet the compliance obligations, and keeping abreast of AB 32 regulatory developments. As the person who bids *654 for greenhouse gas emissions allowances for Morning Star, I believe I am uniquely qualified to describe Morning Star’s goals in participating in the auctions, and methodologies for achieving those goals.
“Morning Star is headquartered at 724 Main Street in Woodland, California.
“Morning Star was founded in 1970 by Chris Rufer, as a one truck owner-operator delivering tomatoes to canneries.
“Currently, Morning Star has three tomato processing plants in the San Joaquin and Sacramento valleys that account for over 25% of the California processing tomato production-supplying 40% of the U.S. ingredient for tomato paste and diced tomato markets-with revenues of approximately $350 million.
“Each of Morning Star’s three tomato processing plants produce carbon emissions through the use of natural gas for tomato processing and canning.
“Beginning in 2013, Morning Star has been regulated as a Covered Entity under California’s Cap and Trade Regulation. Under the current Cap and Trade Regulation, Morning Star, as a Covered Entity, is required to purchase and surrender California Carbon Allowances equal to the amount of carbon emitted as calculated by the regulation.
“Morning Star will receive some allowances free-of-charge based on a benchmark set by 2008-2010 emissions. But these allowances will not be enough to cover all of the emissions at Morning Star’s plants.
“Morning Star is required by the Cap and Trade Regulation to surrender emissions allowances equal to our emissions in future years. If we fail to be in possession of the required amount of allowances at the time they are due, we are subject to costly penalties.
“We do not know what our C02 emissions will be in any future year. We can estimate our emissions based on previous years, but there will be variations due to weather, yields, pests, disease, and other uncontrollable obstacles agricultural industries face. For example, in 2013, the tomato crop was hit by a very damaging pest carrying a disease that wiped out thousands of acres of planted and growing tomatoes. As a result, planters had to replant their crops, and tomatoes that were expected to be ready for harvest in July will not be ready until October. That means that Morning Star will have to keep its tomato processing plants running longer than planned, thereby *655 burning more natural gas and emitting more C02 this year than would be estimated based on past years.
“In an effort to mitigate our risk and control costs associated with compliance with the Cap and Trade Regulation, Morning Star found it necessary and essential to participate in the first two auctions held by CARB. To be in compliance with the Cap and Trade Regulation, Morning Star estimated that it needs to purchase more than 30,000 allowances for 2013. This number is likely to be greater based on the lengthening of the harvest season, as set forth in Paragraph 10.
“CARB has structured the allowance ‘market’ so that allowances will be more expensive in future years. There will be an increase in demand because more facilities will become Covered Entities, and the emissions cap will diminish over time, which will ultimately have the effect of lowering-the supply of allowances made available for auction, as we get closer to the final compliance date of 2020.
“This is reflected in the settlement price of the three auctions held to date. The first auction held in 2012, had a price floor of $10.00, and a settlement price of $10.09: The auctions held in 2013, have a floor price of $10.71, thereby automatically making allowances purchased in those 2013 auctions more expensive than those purchased in the first auction in 2012. The second auction settled at $13.62, while the third auction settled at $14.00. Due to this built-in mechanism by which prices increase with each succeeding auction, it is economically imperative to purchase allowances early in the program.
“There are no cost-effective technologies of which Morning Star is aware that would reduce our emissions of C02, and prevent us from having to purchase emissions allowances. Further, it is infeasible for our food processing plants to run under the 25,000 ton per year threshold of the Cap and Trade Regulation. We would just have to shut down all of the California plants. Morning Star has absolutely no choice but to participate in the auctions if it wants to stay in business in California.
“Purchasing emissions allowances on the open market from others, rather than purchasing them at auction, would make no economic sense because such purchases would be far more expensive than obtaining them directly from CARB at the auctions. That is how the auction market is rigged in CARB’s favor. Were it not so, financial firms would not even consider participating in the auctions. Financial firms participate because they believe they will be able to buy low at auction and sell high in subsequent trades. Covered Entities, on the other hand, do not have that luxury because they *656 must use the allowances for purposes of complying with the Cap and Trade Regulation, and must surrender the allowances to CARB at the end of each compliance period.
“The notion that, as a Covered Entity, Morning Star’s participation in the CARB auctions is somehow ‘voluntary’ is both false and ridiculous.
“Morning Star has no way of determining the total expenditures that may be required by all Covered Entities in California to reduce their carbon dioxide emissions sufficient to comply with the goals of the Cap and Trade Regulation.
“Morning Star has no way of determining the total expenditures that may be required by all Covered Entities in California to deal with the issues raised by global warming.”
Rabo’s declaration was admitted into evidence in the trial court without objection. There was no evidence admitted in the trial court contradicting her declaration. Thus, there was no evidence contradicting Rabo’s declaration that Morning Star’s participation in the auction program was “voluntary” only in the sense that Morning Star could voluntarily cease doing business in California if Morning Star did not participate.
While the trial court did not expressly accept or reject Rabo’s evidence that Morning Star could not continue to do business in California without purchasing the state credits, the court did note that: “Contrary to what ARB argues, the charges have some traditional attributes of a tax. First, the charges are not entirely voluntary. It is important to remember that the allowances have value to covered entities only because the government has forbidden covered entities from emitting GHG without an allowance [noting that ‘[vjirtually every tax is in some sense “voluntary” in that one can avoid the tax by choosing not to engage in the taxed activity. Taken to its logical extreme, even income, sales, and property taxes would not be “compulsory” because they must be paid only if one “voluntarily” earns income, purchases goods, or owns property. Yet no one would dispute these are taxes.’]. The covered entity either must reduce its GHG emissions to zero—which, generally speaking, is impractical or impossible—or acquire allowances. Thus, from the perspective of a covered entity, the purchase of allowances is little different from an emissions tax. In the case of an emissions tax, covered entities obtain the right to emit GHGs by paying the tax; in the case of the cap-and-trade auction, they obtain this right by purchasing all allowances.” (Italics added.)
The trial court at least impliedly accepted Rabo’s declaration to the effect that Morning Star could not continue to do business in California without participating in the auctions and purchasing the necessary credits.
*657 And, while it is true that the trial court did not (by the italicized language above) find that a covered entity had to “acquire allowances” from the state, I note that the state, beginning in 2013, reserved to itself 25 percent of the current year allowances remaining after free allocation and set aside for reserves (Cal. Code Regs., tit. 17, § 95910, subd. (c)), which reservation will increase to approximately 50 percent by 2020. (Maj. opn., ante, at p. 617.)
The majority recognizes that “ ‘[t]he word tax, in its common acceptation, denotes some compulsory exaction, which a government makes upon persons or property within its jurisdiction, for the supply of the public necessities.’ (People v. Naglee (1850) 1 Cal. 232, 253, italics added; see Sinclair Paint, supra, 15 Cal.4th at p. 874 [‘Most taxes are compulsory rather than [a] response to a voluntary decision to develop or to seek other government benefits or privileges’].)” (Maj. opn., ante, at pp. 640-641.) Rabo’s declaration presents the majority with a problem, that is, it is the only evidence in the record on the issue of the “voluntariness” of the purchase of credits, voluntary purchases being one of the three major underpinnings of the majority’s analysis.
Confronted with that problem, in concluding that the state auction program is voluntary, the majority seems to decide that, notwithstanding Rabo’s uncontradicted declaration, Morning Star could stay in business by acquiring—outside of the auction program—the number of credits Morning Star needed to continue to operate its business. There is no evidence to support that conclusion.
Further, the majority characterizes Rabo’s declaration as demonstrating only that participation in the auction program results in nothing more than an increase in costs to do business saying that “the fact that the auction system may result in costs does not make the auction system a tax." (Maj. opn., ante, at p. 644, fn. 27.)
“Rabo does not explain why Morning Star cannot absorb the increased cost of doing business or mitigate the increase in some other fashion. As the Board pointed out at oral argument, a covered entity has a menu of options to achieve compliance, as we have referenced ante. Rabo does not describe any potential mechanism to recoup costs nor why any efforts to recoup costs would fail or prove insufficient. Although Morning Star may ultimately make the business decision that it must pay for allowances in order to maintain its operations in California, making the business decision to pay is not the same as being compelled to do so by the state.” (Maj. opn., ante, at p. 644, fn. & italics omitted.)
The majority then goes on to take the Rabo declaration to task by stating that “the Rabo declaration in large part hinged on the claimed lack of *658 awareness of feasible alternative technologies, but does not set forth what steps Morning Star took to educate itself. Nor did Morning Star include declarations from engineers or scientists that support its economist’s view that no feasible alternatives to currently used emissions control methods exist.” (Maj. opn., ante, at p. 643, fn. 26.)
The majority finally dismisses Rabo’s declaration by speculating, at respondent’s invitation, that Morning Star had a “menu of options” that it could have turned to that would have allowed it to comply with the law without participating in the auctions and stay in business at the same time. (Maj. opn., ante, at p. 644.) But there is no evidence in the record that such is a fact. At its essence, the majority is saying that it simply disbelieves Rabo when she declares that Morning Star could not continue to do business in California without participating in the auctions, a credibility finding not often made in the first instance in my experience by a court of review, especially given the fact that the trial court apparently credited her declaration. In support of its statement of disbelief, the majority cites two cases for the proposition that, unless done arbitrarily, a “trier of fact” may reject the testimony of a witness even though that testimony is uncontradicted. (See Maj. opn., ante, at at pp. 643-644 & fn. 26.) We are not a trier of fact.
While it may be true that some participate in the auctions voluntarily as investors or those who would seek to resell credits, on this record, Morning Star’s participation is not voluntary except in the sense, as noted by the trial court, that California income taxes are voluntary because one need not earn income or live in California as are property taxes as one need not own property.
The majority also says that, even though under the cap-and-trade law, a business may be required to absorb an increase in costs, those costs cannot be considered a tax even if the increased costs require it to go out of business in California, that is, results in “leakage,” which the act anticipated. (Maj. opn., ante, at at p. 644.)
But in all of this the majority misses the point. This is an increase in costs that businesses such as Morning Star must bear if they wish to continue to do business in California; an increase in costs that is, in that sense, compulsory. It is no different than saying that an increase in income taxes is nothing more than an increase in costs that a private business or citizen must bear even though it may require it or him or her to leave California or an increase in property taxes are merely an increase in costs even though it may require the property’s owner to give up its property in California. The point is, the “increase in costs” is compulsory and not voluntary unless one opts to “voluntarily” close their business in the state of California.
*659 I cannot agree that, on this record, Morning Star’s participation in the auctions is voluntary as that word is used in the context of determining whether a state exaction is a tax.
Finally, I must take exception to the majority’s observation that, “[ajlbeit not explicitly, plaintiffs seem to rely on the foundational premise that covered entities have some vested right to continue polluting California’s air without paying for the privilege to do so.” (Maj. opn., ante, at p. 645.) That is not what plaintiffs are saying at all.
We must keep in mind this is not a challenge to the cap-and-trade program overall which requires covered entities to purchase credits if they cannot operate within the guidelines. Plaintiffs accept that. What they are challenging is the lawfulness of the Legislature’s and the State Air Resources Board’s reservation to itself of sufficient credits to require purchase of credits from the state—as opposed to purchasing such credits on the free market—which revenue is used by the state as if it were general fund money, without calling that revenue generation a tax.
II

Auction Credits as Commodities

Working from the premise that the payment of taxes does not ordinarily convey a property right, the majority decides that the auction credits convey a property right in the nature of a commodity. The majority sees the state is selling a “right to pollute.” This is a curious construction to say the least. While, without question, the state, in exercising its police powers, has the ability to legislate in an effort to achieve healthy air quality, it does not mean, conversely, that the state thereby also “owns” rights to pollute which it can sell to others. In any event, I do not find that construct persuasive.
The majority finds the auction proceeds convey a property right notwithstanding the provisions of California Code of Regulations, title 17, section 95820, subdivision (c) which reads: “Each compliance instrument issued by the Executive Officer represents a limited authorization to emit up to one metric ton in C02e of any greenhouse gas specified in section 95810, subject to all applicable limitations specified in this article. No provision of this article may be construed to limit the authority of the Executive Officer to terminate or limit such authorization to emit. A compliance instrument issued by the Executive Officer does not constitute property or a property right.” (Italics added.)
If I read the majority opinion correctly, it avoids what would otherwise be the plain language of this regulation by finding that it speaks only to property *660 rights as against the state while the auction credits retain private property rights between private parties. (Maj. opn., ante, at pp. 647-649.) Accepting at face value that this may be so, the analysis does not recognize that this litigation is not between private parties, but between plaintiffs and the state. The question is whether the state’s exaction of money through the auction program from a business that must participate in that auction in order to stay in business is a tax. The question cannot be avoided by finding the auction credits are valuable assets in the nature of commodities as between private parties buying and selling them as investments.
In my view, in light of the plain language of California Code of Regulations, title 17, section 95820, subdivision (c), which describes (1) an authorization to emit as “limited,” (2) as something that can be terminated or limited at the sole discretion of the state and (3) as something that, by regulation does not convey a property right, the conclusion cannot be avoided that where, as here, entities such as Morning Star are required to purchase auction credits to stay in business, what they purchase is no more a “thing of value” than is the payment of property taxes to keep ownership of one’s home. Whatever else these authorizations are, as to Morning Star and others similarly situated, their value as a “property right” is ephemeral and the auction program cannot be said to convey a property right in the nature of a commodity or otherwise when emission authorizations can be limited or terminated by the state at any time.
The majority’s effort to distinguish the auction programs from a tax by finding that the program conveys property rights in the form of a commodity to Morning Star is not analytically sound.
I note that in support of their analysis, the majority relies in part on Jopson v. Feather River Air Quality Management Dist. (2003) 108 Cal.App.4th 492 [133 Cal.Rptr.2d 506]. But in Jopson, an opinion in which I joined, the court simply stated that emission reduction credits issued by air quality management districts were a “valuable commodity” that could be sold between private parties. (Id, at p. 494.) Jopson does not advance the majority’s opinion here because, first, the court’s description of emission credits as a valuable commodity in Jopson was simply background used to explain the litigation there at hand and, second, the court’s observation was made without analysis or citation to any authority. Jopson certainly did not decide, or even discuss, whether limited authorizations to emit, authorizations that can be limited or terminated at any time, sold by the state to private businesses to be used by those businesses solely to stay in business in this state can or cannot be deemed a valuable commodity.
*661 Finally, as to Jopson, the framework of the opinion assumed the purchase and sale of such credits would be among private parties, a different situation than we have here.
For plaintiffs, it cannot accurately be said that what Morning Star and others in their situation buy at the auctions are commodities carrying property rights. The auctions are instead a revenue vehicle for the state, a vehicle by which businesses are compelled to pay the state and obtain, in return only, the ability to remain in business in California; a state exaction that has all the components of a traditional tax.
Ill

Use of the Auction Proceeds

The majority finds that the use of the revenue generated by the state auctions is a matter not “ripe” for adjudication because it is appropriate to “decouple” the issues of revenue generation and revenue expenditures. (Maj. opn., ante, at p. 650.) But an attempt to avoid factoring in the use of auction revenue on the question of whether or not the auction revenues arise from a tax does not stand up to careful scrutiny.
“The cases recognize that ‘tax’ has no fixed meaning, and that the distinction between taxes and fees is frequently ‘blurred,’ taking on different meanings in different contexts. (Russ Bldg. Partnership v. City and County of San Francisco [(1987)] 199 Cal.App.3d [1496,] 1504 [246 Cal.Rptr. 21]; Terminal Plaza Corp. v. City and County of San Francisco (1986) 111 Cal.App.3d 892, 905 [223 Cal.Rptr. 379]; Mills v. County of Trinity (1980) 108 Cal.App.3d 656, 660 [166 Cal.Rptr. 674]; County of Fresno v. Malmstrom (1979) 94 Cal.App.3d 974, 983-984 [156 Cal.Rptr. 777].) In general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted. (Shapell Industries, Inc. v. Governing Board (1991) 1 Cal.App.4th 218, 240, [1 Cal.Rptr.2d 818]; County of Fresno v. Malmstrom, supra, 94 Cal.App.3d at p. 983 [‘Taxes are raised for the general revenue of the governmental entity to pay for a variety of public services.’].)” (Sinclair Paint, supra, 15 Cal.4th at p. 874.)
As noted in the quote above, in general taxes are imposed for revenue purposes, that is for “the general revenue of the governmental entity to pay for a variety of public services.” (County of Fresno v. Malmstrom, supra, 94 Cal.App.3d at p. 983.)
The majority reasons that, because none of the petitions before us seeks to invalidate known uses of the funds, we can ignore the hardly disputable fact *662 that revenue from the auctions does in fact pay for a broad variety of public services. (Maj. opn., ante, at p. 650.) The majority’s position regarding the relevance of the expansive use of the auction proceeds conveniently avoids having to deal with the broad range of uses reflected in this record which uses, by the authorities quoted above, suggest a particular government exaction is a tax. Once again, I think the majority misses the mark.
The use of the revenue from government exactions is a hallmark, probably the most important one, in determining whether that exaction is a tax. Although not alone determinative, the use of the money must be factored into the analytical equation. If the state treats the revenue as general revenue to be used to pay for public services, that strongly suggests the exaction is a tax.
I would note this court’s decision in Morning Star Co. v. Board of Equalization (2011) 201 Cal.App.4th 737 [135 Cal.Rptr.3d 457] wherein, being asked whether a state exaction imposed as part of a comprehensive state overhaul concerning hazardous wastes was a tax or a regulatory fee, we determined that it was a tax relying largely on the use of the revenue. Thus, “[the exaction] is not regulatory because it does not seek to regulate the Company’s use, generation or storage of hazardous material but to raise money for the control of hazardous material generally. The charge is therefore a tax. At its most basic level, the . . . charge is not a regulatory fee because it is not regulatory. It is monetary.” (Id. at p. 755.)
While I recognize that Morning Star was a tax versus regulatory fee case, its recognition that the use of the funds plays a singular role in the definition of a tax was, and still is, accurate.
The majority’s analysis on this point is, roughly, that none of the plaintiffs challenged the use of the funds as those uses are reflected in this record, therefore we need not consider those uses. But, accepting the majority’s premise that plaintiffs could have challenged those uses, does their failure to do so mean that we can ignore those uses for judging whether or not the program exacts a tax? I think not; the majority’s answer does not meet the challenge because there is nothing in the law that says that plaintiffs must have raised such challenges before we are required to consider the use of the money in deciding the question before us. There is a disconnect in the majority’s analysis. And I note that while perhaps such individual challenges to expenditures could have been made each time the money was spent, it would make no practical or legal sense to piecemeal the litigation as opposed to challenging the entire program as a tax.
Health and Safety Code section 39712 in pertinent part provides:
*663 “(b) Moneys shall be used to facilitate the achievement of reductions of greenhouse gas emissions in this state . . . and, where applicable and to the extent feasible:
“(1) Maximize economic, environmental, and public health benefits to the state.
“(2) Foster job creation by promoting in-state greenhouse gas emissions reduction projects carried out by California workers and businesses.
“(3) Complement efforts to improve air quality.
“(4) Direct investment toward the most disadvantaged communities and households in the state.
“(5) Provide opportunities for businesses, public agencies, Native American tribes in the state, nonprofits, and other community institutions to participate in and benefit from statewide efforts to reduce greenhouse gas emissions.
“(6) Lessen the impacts and effects of climate change on the state’s communities, economy, and environment.
“(c) Moneys appropriated from the fund may be allocated, consistent with subdivision (a), for the purpose of reducing greenhouse gas emissions in this state through investments that may include, but are not limited to, any of the following:
“(1) Funding to reduce greenhouse gas emissions through energy efficiency, clean and renewable energy generation, distributed renewable energy generation, transmission and storage, and other related actions, including, but not limited to, at public universities, state and local public buildings, and industrial and manufacturing facilities.
“(2) Funding to reduce greenhouse gas emissions through the development of state-of-the-art systems to move goods and freight, advanced technology vehicles and vehicle infrastructure, advanced biofuels, and low-carbon and efficient public transportation.
“(3) Funding to reduce greenhouse gas emissions associated with water use and supply, land and natural resource conservation and management, forestry, and sustainable agriculture.
“(4) Funding to reduce greenhouse gas emissions through strategic planning and development of sustainable infrastructure projects, including, but not limited to, transportation and housing.
*664 “(5) Funding to reduce greenhouse gas emissions through increased in-state diversion of municipal solid waste from disposal through waste reduction, diversion, and reuse.
“(6) Funding to reduce greenhouse gas emissions through investments in programs implemented by local and regional agencies, local and regional collaboratives, Native American tribes in the state, and nonprofit organizations coordinating with local governments.
‘“(7) Funding research, development, and deployment of innovative technologies, measures, and practices related to programs and projects funded pursuant to this chapter.”
And, Health and Safety Code section 39719 provides:
‘“(a) The Legislature shall appropriate the annual proceeds of the fund for the purpose of reducing greenhouse gas emissions in this state in accordance with the requirements of Section 39712.
‘“(b) To carry out a portion of the requirements of subdivision (a), annual proceeds are continuously appropriated for the following:
‘“(1) Beginning in the 2015-16 fiscal year, and notwithstanding Section 13340 of the Government Code, 35 percent of annual proceeds are continuously appropriated, without regard to fiscal years, for transit, affordable housing, and sustainable communities programs as following:
‘“(A) Ten percent of the annual proceeds of the fund is hereby continuously appropriated to the Transportation Agency for the Transit and Intercity Rail Capital Program created by Part 2 (commencing with Section 75220) of Division 44 of the Public Resources Code.
‘“(B) Five percent of the annual proceeds of the fund is hereby continuously appropriated to the Low Carbon Transit Operations Program created by Part 3 (commencing with Section 75230) of Division 44 of the Public Resources Code. Funds shall be allocated by the Controller, according to requirements of the program, and pursuant to the distribution formula in subdivision (b) or (c) of Section 99312 of, and Sections 99313 and 99314 of, the Public Utilities Code.
‘“(C) Twenty percent of the annual proceeds of the fund is hereby continuously appropriated to the Strategic Growth Council for the Affordable Housing and Sustainable Communities Program created by Part 1 (commencing with Section 75200) of Division 44 of the Public Resources Code. Of the *665 amount appropriated in this subparagraph, no less than 10 percent of the annual proceeds, shall be expended for affordable housing, consistent with the provisions of that program.
“(2) Beginning in the 2015-16 fiscal year, notwithstanding Section 13340 of the Government Code, 25 percent of the annual proceeds of the fund is hereby continuously appropriated to the High-Speed Rail Authority for the following components of the initial operating segment and Phase I Blended System as described in the 2012 business plan adopted pursuant to Section 185033 of the Public Utilities Code:
“(A) Acquisition and construction costs of the project.
“(B) Environmental review and design costs of the project.
“(C) Other capital costs of the project.
“(D) Repayment of any loans made to the authority to fund the project.
“(c) In determining the amount of annual proceeds of the fund for purposes of the calculation in subdivision (b), the funds subject to Section 39719.1 shall not be included.”
Health and Safety Code section 39713 provides:
“(a) The investment plan developed and submitted to the Legislature pursuant to Section 39716 shall allocate a minimum of 25 percent of the available moneys in the fund to projects located within the boundaries of, and benefiting individuals living in, communities described in Section 39711.
“(b) The investment plan shall allocate a minimum of 5 percent of the available moneys in the fund to projects that benefit low-income households or to projects located within the boundaries of, and benefiting individuals living in, low-income communities located anywhere in the state.
“(c) The investment plan shall allocate a minimum of 5 percent of the available moneys in the fund either to projects that benefit low-income households that are outside of, but within a 1/2 mile of, communities described in Section 39711, or to projects located within the boundaries of, and benefiting individuals living in, low-income communities that are outside of, but within a 1/2 mile of, communities described in Section 39711.
“(d) For purposes of this subdivision, the following definitions shall apply:
*666 “(1) ‘Low-income households’ are those with household incomes at or below 80 percent of the statewide median income or with household incomes at or below the threshold designated as low income by the Department of Housing and Community Development’s list of state income limits adopted pursuant to Section 50093.
“(2) ‘Low-income communities’ are census tracts with median household incomes at or below 80 percent of the statewide median income or with median household incomes at or below the threshold designated as low income by the Department of Housing and Community Development’s list of state income limits adopted pursuant to Section 50093.
“(e) Moneys allocated pursuant to one subdivision of this section shall not count toward the minimum requirements of any other subdivision of this section.”
Health and Safety Code section 39711 referenced in Health and Safety Code section 39713 quoted above provides in relevant part:
“(a) The California Environmental Protection Agency shall identify disadvantaged communities for investment opportunities related to this chapter. These communities shall be identified based on geographic, socioeconomic, public health, and environmental hazard criteria, and may include, but are not limited to, either of the following:
“(1) Areas disproportionately affected by environmental pollution and other hazards that can lead to negative public health effects, exposure, or environmental degradation.
“(2) Areas with concentrations of people that are of low income, high unemployment, low levels of homeownership, high rent burden, sensitive populations, or low levels of educational attainment.”
Item 3900-011-3228 of the Budget Act of 2013 (Stats. 2013, ch. 20, § 2, Item 3900-011-3228) provides that the State Controller will, upon the order of the Director of Finance, transfer $500 million from the Greenhouse Gas Reduction Fund to the General Fund as a loan.
Health and Safety Code section 39719.1 provides:
“(a) Of the amount loaned from the fund to the General Fund pursuant to Item 3900-011-3228 of Section 2.00 of the Budget Act of 2013, four hundred million dollars ($400,000,000) shall be available to the High-Speed Rail Authority pursuant to subdivision (b).
*667 “(b) The portion of the loan from the fund to the General Fund described in subdivision (a) shall be repaid to the fund as necessary based on the financial needs of the high-speed rail project. Beginning in the 2015-16 fiscal year, and in order to carry out the goals of the fund in accordance with the requirements of Section 39712, the amounts of all the loan repayments, notwithstanding Section 13340 of the Government Code, are continuously appropriated from the fund to the High-Speed Rail Authority for the following components of the initial operating segment and Phase I Blended System as described in the 2012 business plan adopted pursuant to Section 185033 of the Public Utilities Code:
“(1) Acquisition and construction costs of the project.
“(2) Environmental review and design costs of the project.
“(3) Other capital costs of the project.
“(4) Repayment of any loans made to the authority to fund the project.”
Thus, the revenues generated by the auctions can be used by the state for, at least:
(1) funding to maximize economic, environmental and public health benefits to the state;
(2) funding to foster job creation by promoting in-state greenhouse gas emissions projects;
(3) funding to improve air quality;
(4) funding to direct investment in disadvantaged communities;
(5) funding to provide opportunities for businesses, public agencies, Native American tribes and others to participate in and enjoy the benefits of the reduction of greenhouse gases;
(6) funding to lessen the impacts of climate change on the state’s communities, economy and environment;
(7) funding to promote energy efficiency, renewable energy generation, distributed renewable energy generation, transmission and storage and other related actions at, among other places universities, state and local public buildings, and industrial and manufacturing abilities;
*668 (8) funding to develop state-of-the-art systems to move goods and freight, advanced technology vehicles and vehicle infrastructure, advance biofuels, and low-carbon transportation;
(9) funding to reduce greenhouse gas emissions associated with water use and supply, land and natural resource conservation and management, forestry, and sustainable agriculture;
(10) funding strategic planning and development of sustainable infrastructure projects including transportation and housing;
(11) funding for in-state diversion of municipal solid waste through waste reduction, diversion, and reuse;
(12) funding to lower emissions through investments in programs implemented by local and regional agencies and others coordinating with local governments;
(13) funding for research, development, and deployment of innovative technologies, measures and practices;
(14) a continuous appropriation of 10 percent of the proceeds from the auction fund for the transit and intercity rail;
(15) a continuous appropriation of 5 percent for low-carbon transit programs;
(16) a continuous appropriation of 20 percent for the affordable housing and sustainable communities program; and
(17) a continuous appropriation of 25 percent to high-speed rail.
To the obvious broad use of the auction revenues, and in order to avoid having to consider the effect of the use of the proceeds on the question before us, respondents argue that the uses of the proceeds are merely advancing the intent of the program, that is, to reduce greenhouse gases and are, therefore, used more narrowly than general revenue funds.
Asked during oral argument what the expenditures on affordable housing had to do with emissions, respondents said the affordable housing was to be built near places of employment and transportation hubs to encourage public transportation and reduce greenhouse gas emissions accordingly. Following that line of argument would probably allow the proceeds to be spent on *669 education on the theory that a better educated populace on the question of greenhouse gas emissions would be more likely to seek to reduce those emissions in the future.
Respondents’ argument conflates funding of the costs of administering the auction program with funding of the goals of cap and trade.
And here is the magic, the sleight of hand, of respondents’ argument. Since an argument can be, and has been, made that nearly all human activity (and, apparently, some animal activity) increases greenhouse gases, voila, auction funds can be used to address nearly any human activity without being considered a tax that generates general revenue, thus avoiding the prohibitions of Proposition 13, so long as the use of the funds has any tenuous connection to the reduction of greenhouse gases, connections that can always be found if one reaches far enough.
Howard Jarvis Taxpayers Assn. v. County of Orange (2003) 110 Cal.App.4th 1375 [2 Cal.Rptr.3d 514] (Howard Jarvis) is instructive. There, the City of Huntington Beach amended its city charter effective July 1978 (1) to mandate the city’s participation in a retirement system, (2) gave the city council discretion to establish reasonable compensation and fringe benefits as appropriate and (3) established an excise tax on real property to fund the retirement program.
After that, and after the passage of Proposition 13, the city added to those city retirement benefits and collected increased excises tax to fund those additional benefits. A taxpayer brought suit contending the excise tax, to the extent it funded additional retirement benefits granted after July 1978, violated Proposition 13.
The city argued there was no violation because the 1978 city charter language gave the city a right to levy the excess tax for virtually anything so long as the costs the excess tax funded related to city employee retirement benefits “including ‘giv[ing] a house ... to every employee as they retire . . . [¶] . . . .’ ” (Howard Jarvis, supra, 110 Cal.App.4th at p. 1383.)
The court disagreed and observed that the city’s argument would eviscerate Proposition 13 adding: “Under City’s interpretation, it would have virtually unfettered power to spend whatever sum of money and levy excess taxes to obtain the revenue, as long as the expenditure was designated ‘retirement.’ This was one of the very things Proposition 13 was enacted to combat.” (.Howard Jarvis, supra, 110 Cal.App.4th at p. 1384.)
So too here. The state’s argument gives it “virtually unfettered” power to spend whatever money the auction program raises so long as the purpose of the money is to a theoretical reduction of greenhouse gases.
*670 Despite the practically unlimited use of the auction program’s revenues for state projects, the state seeks to end-run the provisions of Proposition 13 by labeling the wide and varied uses of that revenue as uses that address (not necessarily reduce), however tangentially, greenhouse gas emissions. The majority’s “decoupling” of the question of the use of the revenues generated by the auction program is, to say the least, unconvincing.
IV

The Auction Program as a Tax

It needs to be noted that the auction program revenues are not necessary to the funding of the cap-and-trade program in general or the auction program in particular.
Health and Safety Code section 38597 says: “The [State Air Resources Board] may adopt by regulation, after a public workshop, a schedule of fees to be paid by the sources of greenhouse gas emissions regulated pursuant to this division, consistent with Section 57001. The revenues collected pursuant to this section, shall be deposited into the Air Pollution Control Fund and are available upon appropriation, by the Legislature, for purposes of carrying out this division.”
Pursuant to the statutory authority granted by Health and Safety Code section 38597, the State Air Resources Board adopted California Code of Regulations, title 17, section 95200 (Cal. Code of Regs., tit. 17, §§ 95200, 95203), which provides: “The purpose of this subarticle is to collect fees to be used to carry out the California Global Warming Solutions Act of 2006 (Stats. 2006; Ch. 488; Health and Safety Code sections 38500 et seq.), as provided in Health and Safety Code section 38597.”
The State Air Resources Board also adopted California Code of Regulations, title 17, section 95203 which further provides:
“(a) Total Required Revenue (TRR).
“(1) The Required Revenue (RR) shall be the total amount of funds necessary to recover the costs of implementation of AB 32 program expenditures for each fiscal year, based on the number of personnel positions, including salaries and benefits and all other costs, as approved in the California Budget Act for that fiscal year.
“(2) The RR shall also include any amount required to be expended by ARB in defense of this subarticle in court.
*671 “(3) If there is any excess or shortfall in the actual revenue collected for any fiscal year, such excess or shortfall shall be carried over to the next year’s calculation of the Total Revenue Requirement. If ARB does not expend or encumber the full amount authorized by the California Legislature for any fiscal year, the amount not expended or encumbered in that fiscal year shall be carried over and deducted from the next year’s calculation of the Total Revenue Required.
“(4) The annual Total Revenue Requirement is equal to the annual RR adjusted for the previous fiscal year’s excess or shortfall amount, as provided in subsection (a)(4).” (Cal. Code of Regs., tit. 17, § 95203, subd. (a), italics omitted.)
It would thus appear that auction proceeds are not intended, or, more importantly needed, to pay for the costs of implementation of Assembly Bill No. 32 (2005-2006 Reg. Sess.).
The only reasonable conclusion one can reach is that the auction proceeds are intended to, and do, generate general revenue to the State of California. It is apparent that by respondent’s express acknowledgement, this revenue may be used for any program that, arguably, might reduce greenhouse gases. But, as noted above, the effort to reduce greenhouse gases essentially encompasses all aspects of human activity and thus the use of the auction revenues by the state is virtually unlimited. Thus, the purchase of auction credits which, on this record, are imposed on Morning Star and businesses similarly situated, creates revenue to pay for a nearly unlimited variety of public services. (See, County of Fresno v. Malmstrom, supra, 94 Cal.App.3d at p. 983 [‘“Taxes are raised for the general revenue ... to pay for a variety of public services”].) This is a tax increase on businesses knowingly structured to avoid the provisions of Proposition 13.
Accepting the argument that there is social value to the cap-and-trade program, questions of the social value of any given law are the province of the Legislature and the Governor. It is the province of the courts to decide questions of law and the constitutionality of the laws and to do so based solely on the law regardless of the social value of the challenged legislation.
My colleagues and I have worked diligently on what is obviously a complex and difficult appeal. They, in good faith, have reached a conclusion different than mine. I simply cannot agree with their analysis or their result.
Given that the auction program is, for Morning Star and businesses that are similarly situated, compulsory if they are to remain in business in California and that the auction program creates, in actual effect, general revenue, I can *672 only conclude that the program is a tax in “something else” clothing and that the auction program, not having been passed by a two-thirds vote in the Legislature, violates Proposition 13.
I would reverse the judgment.
The petitions of all appellants for review by the Supreme Court were denied June 28, 2017, S241948. Cantil-Sakauye, C. J., did not participate therein.